# STATE OF CONNECTICUT *v.* SALVATORE CICCIO
## (AC 22088)

Dranginis, West and Hennessy, Js.

Argued February 6—officially released June 10, 2003

*Martin Zeldis*, senior assistant public defender, with whom were *April E. Brodeur*, certified legal intern, and, on the brief, *Jennifer M. Barry*, certified legal intern, for the appellant (defendant).

*Nancy L. Chupak*, assistant state's attorney, with whom, on the brief, were *Scott J. Murphy*, state's attorney, and *Vernon D. Oliver*, assistant state's attorney, for the appellee (state).

*Opinion*

WEST, J. The defendant, Salvatore Ciccio, appeals from the judgment of conviction, rendered after a jury trial, of assault in the first degree in violation of General Statutes § 53a-59 (a) (1). On appeal, the defendant claims that the trial court improperly (1) instructed the jury as to the use of uncharged misconduct for purposes of intent and identity, and (2) admitted evidence of (a) a prior felony conviction and (b) an oral statement that he made to a state police trooper. He also claims that (3) he was deprived of his constitutional right to a unanimous verdict. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the evening of February 28, 1998, a group of

young people had gathered at the Robotham home in Burlington to celebrate William Robotham's return from Navy boot camp. Invitations to the party were extended by word of mouth. Although most of the people at the party were younger than twenty-one, they were consuming alcoholic beverages, including beer and liquor. Some of them were smoking marijuana. Nineteen year old Anthony Salmoiraghi, the victim, was at the party and had consumed a significant quantity of beer and liquor.[1]

Sometime during the evening, Christopher Willard, the defendant's stepson, arrived at the party with his friend, David Hitchiner. For reasons that are not clear, Michael Robotham, William Robotham's brother, disliked Hitchiner or Willard. He slapped Hitchiner and told him that he and Willard were not welcome at the party and had to leave. Shortly after the two unwelcome young men left the party, people inside the Robotham home heard the sound of glass breaking. Michael Robotham found broken beer bottles at the end of the driveway. He and others assumed that Willard and Hitchiner had broken the glass in the driveway because they had been asked to leave. The Robotham brothers and their friends decided to retaliate against Hitchiner and Willard by going to Willard's home and breaking beer bottles in the driveway. The Robotham group took a garbage bag full of beer bottles and drove to George Washington Turnpike in Burlington, where Willard lived with his family, including his mother, Susan Ciccio, and her husband, the defendant.

Prior to the arrival of the Robotham group, Willard and Hitchiner entered the house, where a group of friends of Jason Willard, Christopher Willard's brother, had gathered. Christopher Willard and Hitchiner told

---

[1] At the time Salmoiraghi was admitted to the University of Connecticut Medical Center, his blood alcohol level was 0.2 percent.

the group what had happened at the Robotham house. The Willard group was upset over the incident. When the Robotham group arrived at the defendant's house at about 11:15 p.m., they exited their vehicles, walked up the driveway, broke beer bottles and created a disturbance in front of the house. The Willard brothers went outside with their friends to confront the Robotham group. There was conflicting testimony as to the number of people, ranging from six to twenty-five, in the yard and driveway. Accusations and insults were exchanged; arguments and fights ensued. Keith Ferreira, a member of the Robotham group, and Christopher Willard engaged in a fight.

Prior to Christopher Willard's return from the Robotham residence, the defendant and Susan Ciccio had retired for the evening. The defendant was awakened by shouts from the lower level of the house. Susan Ciccio exited the house in an effort to stop the disturbance. The defendant followed her when he heard screaming and assumed that his wife had been injured.[2] The defendant testified that he took a baseball bat into the front yard and was holding it in front of him with both hands in an effort to push people away.

The defendant also attempted to intervene in the fight between Christopher Willard and Ferreira. When Salmoiraghi saw the defendant, he was holding a cylindrical wooden object[3] and confronting Ferreira. Salmoiraghi spoke to the defendant.[4] The defendant

---

[2] Susan Ciccio was injured that night, but not at the time in question. Sometime after Salmoiraghi had been injured and had left the premises, another member of the Robotham group punched her in the face.

[3] The testimony at trial was conflicting as to whether the wooden object was the handle of an ice hockey stick, the handle of a shovel or a baseball bat. The defendant testified that he hit Salmoiraghi with a baseball bat. In this opinion, we therefore will refer to the wooden object used to strike Salmoiraghi as a bat.

[4] Salmoiraghi testified that he told the defendant with respect to the bat, "You don't want to use that because you'll get in trouble. Cops will be here and everything." According to the defendant, Salmoiraghi said, "Ain't nobody going to leave this f-ing yard."

testified that Salmoiraghi then charged him and that he was fearful of the larger, younger man. He also testified that he had been holding the bat, midshaft, in his right hand, but he raised it in front of him with both hands to protect himself from Salmoiraghi. The bat was knocked out of his hand and hit Salmoiraghi. Witnesses, however, saw the defendant swing the bat, with a "choked up hold," at the victim and heard a cracking sound. After he had struck Salmoiraghi, witnesses also heard the defendant say, "Oh, yeah."

Salmoiraghi fell to the ground unconscious and had to be assisted by his friends, who took him to the University of Connecticut Medical Center's John Dempsey Hospital. Salmoiraghi's jaw was broken in three places and required surgical repair by means of internal fixation. According to Thomas J. Regan, the emergency medicine physician who examined the victim, Salmoiraghi's injury was the result of a direct blow of significant force, not an accidental hit.[5]

After he hit Salmoiraghi, the defendant was shocked and dazed. He left the scene and walked nine miles to his father's home in Southington. He returned home the next day, but could not recall details of the night

---

[5] Regan testified as follows in response to questions from the prosecutor:

"[Prosecutor]: Would you please describe [Salmoiraghi's] condition, at the time [you saw him in the emergency room], as best you can recall?

"[The Witness]: Sure . . . . [He] had lost consciousness and had fallen to the ground. His friend was there and corroborated the story, that he did—was hit. Did fall to the ground. Did lose [consciousness] only for a couple of seconds.

* * *

"[Prosecutor]: Is loss of consciousness consistent with being struck with significant force?

"[The Witness]: Yes.

"[Prosecutor]: As opposed to a glancing blow?

"[The Witness]: Correct.

"[Prosecutor]: Or an accidental?

"[The Witness]: Correct. It takes a significant amount of force to cause a loss of consciousness."

before. He testified that he was in a haze for two weeks. The defendant went to the police station on March 1, 1998, and gave a written statement. On April 5, 1998, Jeffrey Keegan, a state police trooper, arrested the defendant. Keegan testified that during a conversation with the defendant, he asked the defendant what he was thinking at the time he hit Salmoiraghi. The defendant replied that he could have killed Salmoiraghi if he had wanted to do so. The defendant's reply does not appear in Keegan's report of the arrest.

The defendant was charged with assault in the first degree in violation of § 53a-59. The case was tried to a jury in March, 2001. After the jury convicted the defendant of violating § 53a-59 (a) (1), he was sentenced to fifteen years in prison, suspended after a mandatory five year term, and five years of probation. The defendant appealed.

I

The defendant's first claim is that the court improperly instructed the jury that it could find that he had the requisite intent to commit assault in the first degree and that he was the person who committed the assault on Salmoiraghi on the basis of certain uncharged misconduct, namely, that he allegedly possessed and grew marijuana. In support of his claim that the instruction was improper, the defendant has argued that he denied the misconduct, there was no evidence to support the alleged misconduct and the misconduct was not related to the charge of assault in the first degree.

Before we consider the defendant's claim of an improper jury instruction, we must first determine whether it is reviewable. The following facts are relevant to our determination. Both the prosecutor and defense counsel submitted requests to charge, but neither request contained an instruction with regard to

prior uncharged misconduct.[6] At the conclusion of the presentation of evidence, the court reviewed its proposed instruction with both counsel. On the record, the court asked the prosecutor: "Evidence of prior misconduct of the defendant, his admission that he possessed and grew marijuana? You want that?" The prosecutor responded in the affirmative. Defense counsel did not object or say anything in response to the court's question. When the court instructed the jury, it gave a misconduct charge. Defense counsel did not take an exception to the court's instruction. Because he did not preserve the record for our review, the defendant has asked this court to review his claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989),[7] or the plain error doctrine. See Practice Book § 60-5.

The record is adequate for our review. Whether the defendant's claim is of constitutional magnitude requires a closer examination, as the defendant claims that the court's instruction deprived him of his constitutional right to due process of law, in part, because there was no evidence to warrant a misconduct charge. The state has argued that the claim is not one of constitutional dimension, but instead is an evidentiary claim. We agree with the defendant.

"It is clear that [t]he trial court should submit no issue to the jury which is foreign to the facts in evidence,

---

[6] As part of its request to charge, the state requested that the court instruct the jury on character and reputation evidence, and prior convictions of a witness or defendant.

[7] "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

or upon which no evidence was offered, and it should not submit to the jury considerations which find no support in the evidence. *State* v. *Cofone*, 164 Conn. 162, 168, 319 A.2d 381 (1972) . . . ." (Internal quotation marks omitted.) *State* v. *Campbell*, 225 Conn. 650, 659, 626 A.2d 287 (1993); see also *State* v. *Santangelo*, 205 Conn. 578, 594, 534 A.2d 1175 (1987); *State* v. *Rodgers*, 198 Conn. 53, 56, 502 A.2d 360 (1985); *State* v. *Joyce*, 45 Conn. App. 390, 402, 696 A.2d 993 (1997), appeal dismissed, 248 Conn. 669, 728 A.2d 1096 (1999). A court may not permit the jury to draw an inference material to the verdict from facts not in evidence. *Bell* v. *Bihary*, 168 Conn. 269, 273, 362 A.2d 963 (1975). Because the basis of the defendant's claim is, in part, that the court gave an instruction about which there was no evidence, the second prong of *Golding* has been met; see footnote 7; and we will review the defendant's claim. See *State* v. *Samuels*, 75 Conn. App. 671, 693, 817 A.2d 719 (2003) (first two requirements of *Golding* involve determination of whether claim is reviewable).

We will now turn our attention to the third prong of *Golding*, that is, to determine whether the constitutional violation clearly existed in that the court instructed the jury on prior misconduct on the basis of facts that were not in evidence. "When reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly represents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance

of the jury . . . we will not view the instructions as improper. . . .

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. . . . It is axiomatic that the state is required to prove all the essential elements of the crimes charged beyond a reasonable doubt in order to obtain a conviction. . . . A jury instruction is constitutionally adequate if it provides the jurors with a clear understanding of the elements of the crime charged, and . . . afford[s] proper guidance for their determination of whether those elements were present." (Citation omitted; internal quotation marks omitted.) *State* v. *Vicente*, 62 Conn. App. 625, 630, 772 A.2d 643 (2001). "[I]n appeals involving a constitutional question, [the standard is] whether it is reasonably possible that the jury [was] misled." (Internal quotation marks omitted.) *State* v. *Davis*, 261 Conn. 553, 564, 804 A.2d 781 (2002).

With respect to prior misconduct, the court instructed the jury in relevant part: "In this case, *evidence was offered by the state* that the defendant possessed marijuana and grew it in his backyard. Evidence of prior acts of misconduct of the defendant is not being admitted to prove the bad character of the defendant or his tendency to commit criminal acts. Such evidence is being admitted solely to show or establish the existence of the intent, which is a necessary element of the charged crime in count one. That is, assault in the first degree with intent to cause serious physical injury in violation of § 53a-59 (a) (1) and the identity of the person . . . who committed the crime, that is, the defendant."[8]

---

[8] The remainder of the court's instruction on prior misconduct evidence follows: "You may not consider such evidence as establishing a predisposition on the part of the defendant to commit any of the crimes charged or to demonstrate a criminal propensity. You may consider such evidence, if

In its brief to this court, the state concedes that the trial court was mistaken when it stated that the *state* had introduced evidence that the defendant had possessed marijuana and grown it in his backyard. The prosecutor cross-examined the defendant about his possession of marijuana and whether he grew it in his backyard at the time of the crime at issue here.[9] The defendant

you believe it, and further find it logically, rationally and conclusively supports the issues for which it is being offered by the state. But only as it may bear here on the issues of the existence of the intent, which is a necessary element of the crime charged in count one, that is, assault in the first degree with intent to cause serious physical injury in violation of § 53a-59 (a) (1) and the identity of the person who committed that crime, that is, the defendant.

"On the other hand, if you do not believe such evidence, or even if you do, if you find that it does not logically, rationally and conclusively support the issues for which it is being offered by the state, namely, the existence of the intent, which is a necessary element of the crime charged in count one, that is, assault in the first degree with intent to cause serious physical injury in violation of § 53a-59 (a) (1) and the identity of the person who committed the crime, that is, the defendant, then you may not consider that testimony for any purpose.

"You may not consider evidence of prior misconduct, even for the limited purpose of attempting to prove assault in the first degree, because it may predispose your mind, uncritically, to believe that the defendant may be guilty of the offense here charged merely because of the alleged prior misconduct. For this reason, you may consider this evidence only on the issues of the existence of the intent, which is a necessary element of the crime charged in count one, that is, assault in the first degree with intent to cause serious physical injury in violation of § 53a-59 (a) (1) and the identity of the person who committed the crime, that is, the defendant, then you may not consider that testimony for any purpose and for no other purpose."

[9] The prosecutor cross-examined the defendant in relevant part as follows:

"[Prosecutor]: When your lawyer asked you if you had used any drugs, you asked, you said that day?

"[Defendant]: Yes, I did.

"[Prosecutor]: Were you using any drugs that day?

"[Defendant]: No, sir.

"[Prosecutor]: Were you using any of that marijuana you were growing in your backyard?

"[Defendant to the court]: Ma'am, that's an accusation.

"The Court: Don't look at me and make a comment.

"[Defendant]: I'm sorry, ma'am. I've never grown marijuana in my backyard.

denied that at the time of the assault, he possessed marijuana and that he grew it in his backyard. The state also concedes that it never introduced evidence that the defendant possessed marijuana at the time of the assault. Furthermore, there was no evidence that the defendant had ever grown marijuana in his backyard. On direct and redirect examination, however, the defendant[10] and

"[Prosecutor]: Isn't it true, you told Trooper Timothy Webster, on March 6, 1998, that you were growing marijuana in your backyard. And that the marijuana you had on you was the last of that stash?

"[Defendant]: Well, considering the fact that I was in a haze at the time, I know what I [t]old the officer. And I have no idea why I would have said something that wasn't true to the officer.

"[Prosecutor]: Do you remember being pulled over by Trooper Webster?

"[Defendant]: Approximately a month afterward, perhaps.

"[Prosecutor]: About five days after, March 6, 1998?

"[Defendant]: No, I don't remember that, sir.

"[Prosecutor]: No. You don't remember that?

"[Defendant]: No, sir.

"[Prosecutor]: You remember coming to court in relation to that?

"[Defendant]: No, sir.

"[Prosecutor]: No?

"[Defendant]: No.

"[Prosecutor]: Remember being arrested for that?

"[Defendant]: What? For this incident?

"[Prosecutor]: No. On March 6, 1998?

"[Defendant]: No, sir. I don't remember anything on March 6."

[10] The defendant testified on direct and redirect examination as follows:

"[Defense Counsel]: Now, that day, did you have any alcoholic beverages?

"[Defendant]: No, I didn't, ma'am. I hardly ever drink.

"[Defense Counsel]: Did you use any illegal drugs?

"[Defendant]: That day?

"[Defense Counsel]: Yes.

"[Defendant]: No ma'am, I didn't.

"[Defense Counsel]: During that time sequence, were you using illegal drugs?

"[Defendant]: No ma'am."

\* \* \*

"[Defense Counsel]: Have you ever grown marijuana?

"[Defendant]: When I was much younger. Teens.

"[Defense Counsel]: I'm sorry?

"[Defendant]: In my teens.

"[Defense Counsel]: Had you ever—did you ever grow marijuana at this house where this incident took place?

"[Defendant]: Never. I wouldn't even allow the kids to drink in the house,

Susan Ciccio[11] testified that many years prior to the assault, the defendant had used marijuana. We have reviewed the entire transcript and concur with the state's representation of the evidence.[12]

It would appear that the court's mention that the defendant possessed marijuana and grew it in his backyard was in reference to the prosecutor's cross-examination concerning activity in 1998, which the defendant denied. See footnote 9. The transcript reveals, however, that the defendant used marijuana, not at the time of the assault, but in the distant past. Although the jury may have inferred that he at some time in his life possessed marijuana, there clearly was no evidence that the defendant grew it in his backyard. With respect to the growing of marijuana in his backyard, the charge was improper, as there was no evidence of that fact.

The court repeatedly instructed the jury, however, that it was the arbiter of fact, and that what the court

---

let alone smoke pot and grow pot and all that.

"[Defense Counsel]: But at times, did they drink?

"[Defendant]: Evidently so. I wasn't there twenty four hours a day. I couldn't keep control of them to that extent, ma'am."

[11] On redirect examination, Susan Ciccio testified in relevant part as follows:

"[Defense Counsel]: Did you routinely keep marijuana on your premises?

"[The Witness]: No, not at all.

"[Defense Counsel]: What about your husband?

"[The Witness]: He has—in the years past, yes.

"[Defense Counsel]: In years past. Well, this was three years ago. Let's talk about three years ago?

"[The Witness]: No.

"[Defense Counsel]: Is it your testimony that your husband did not have marijuana on himself or the premises on or about March 1, 1998?

"[The Witness]: I—on March 1?

"[Defense Counsel]: When this happened.

"[The Witness]: I couldn't tell you."

[12] The subject of marijuana was raised several times during the trial. There was testimony that Hitchiner and Christopher Willard sold marijuana and that they offered it for sale when they were at the Robotham party. Although that evidence was irrelevant to the issues at trial, we cannot say whether it had any effect on the jury.

and counsel said was not evidence, particularly that questions asked by counsel were not evidence. The jury's recollection of the facts was to prevail, not what the court or counsel may have said. Furthermore, in the portion of the charge at issue, the court instructed the jury that it could consider the "evidence" only if it believed the evidence and if it logically, rationally and conclusively supported the issues for which it had been offered. We do not know what the jury found or concluded, but we cannot conclude that the jury was not misled by the instruction.

Assuming for purposes of this appeal that the jury found that the defendant possessed marijuana, we must consider whether the misconduct charge was warranted. The state concedes in its brief that marijuana possession is irrelevant to the elements of intent and identity in a case of assault in the first degree. We agree that there is absolutely no relation between growing and possessing marijuana and assault in the first degree, and that evidence to that effect could not be used properly for purposes of identity and intent in this case.

Our analysis, however, does not end there. If the state is able to demonstrate that the improper jury instruction was harmless beyond a reasonable doubt, the defendant cannot prevail. "Where counsel . . . seeks to raise on appeal a potential defect in the jury charge which he did not raise at trial, his silence at trial is a powerful signal that, because of the posture of the case, he did not hear the defect in the harmful manner which he presses on appeal, or even if he did so hear it, he did not deem it harmful enough to press in the trial court. When the principal participant in the trial whose function it is to protect the rights of his client does not deem an issue harmful enough to press in the trial court, the appellate claim that the same issue clearly deprived the defendant of a fundamental constitutional right and a fair trial . . . is seriously undercut." (Citation omit-

ted; internal quotation marks omitted.) *State* v. *Manfredi*, 17 Conn. App. 602, 624, 555 A.2d 436 (1989), aff'd, 213 Conn. 500, 569 A.2d 506, cert. denied, 498 U.S. 818, 111 S. Ct. 62, 112 L. Ed. 2d 37 (1990).

We have no way of knowing whether the jury found that the defendant possessed marijuana or grew it or whether it considered those facts relevant to the issues of identity and intent with respect to the charge of assault in the first degree. For the sake of argument only, if we assume that the jury found those facts and drew the inference discussed by the court, we would conclude that it was harmless beyond a reasonable doubt in view of the overwhelming evidence that the defendant hit Salmoiraghi with a bat and broke his jaw. There is no question that the defendant was holding the bat when it hit Salmoiraghi, as the defendant himself testified that he was protecting himself with the bat when it was knocked out of his hand and struck the young man. Although he claimed that hitting Salmoiraghi was an accident, there was considerable testimony that the defendant swung the bat in response to Salmoiraghi's telling him not to use it. Witnesses heard a crack and saw Salmoiraghi fall to the ground. They also heard the defendant say, "Oh, yeah." Prior to putting the bat in both hands, the defendant claimed that he was holding it in his right hand, midshaft. Witnesses testified that when he swung the bat, it was "choked up." The defendant was shocked and left the scene.

Regan, the emergency room physician, testified that an inadvertent blow to the head is not enough to cause unconsciousness. Salmoiraghi was hit with considerable force that caused his jaw to be broken in three places. When Keegan, the arresting state trooper, questioned the defendant about what he was thinking when he hit Salmoiraghi, he stated that he could have killed the young man if he had wanted to do so. The prosecutor, in final argument to the jury, did not mention the

defendant's possession or growing of marijuana. We also note that the defendant has not challenged the sufficiency of the evidence to support his conviction. We therefore conclude that the court's improper instruction was harmless beyond a reasonable doubt, as there was overwhelming evidence by which the jury could have inferred that the defendant intended to cause serious physical injury to Salmoiraghi in violation of § 53a-59 (a) (1).

## II

The defendant next claims that the court improperly admitted evidence of (1) a prior felony conviction and (2) an oral statement that he made to a state police trooper. We disagree.

"Our standard of review for evidentiary matters allows the trial court great leeway in deciding the admissibility of evidence. The trial court has wide discretion in its rulings on evidence and its rulings will be reversed only if the court has abused its discretion or an injustice appears to have been done. . . . The exercise of such discretion is not to be disturbed unless it has been abused or the error is clear and involves a misconception of the law. . . . *State* v. *Russo*, 62 Conn. App. 129, 133, 773 A.2d 965 (2001). Sound discretion, by definition, means a discretion that is not exercised arbitrarily or wilfully, but with regard to what is right and equitable under the circumstances and the law . . . . And [it] requires a knowledge and understanding of the material circumstances surrounding the matter . . . . In our review of these discretionary determinations, we make every reasonable presumption in favor of upholding the trial court's ruling. . . . *State* v. *Lomax*, 60 Conn. App. 602, 607–608, 760 A.2d 957, cert. denied, 255 Conn. 920, 763 A.2d 1042 (2000)." *State* v. *Pare*, 75 Conn. App. 474, 478, 816 A.2d 657, cert. denied, 263 Conn. 924, 823 A.2d 1216 (2003).

## A

The defendant's first evidentiary claim is that the court permitted the state to present evidence that he was twice convicted of burglary in 1986.

The following additional facts are necessary for our resolution of the defendant's claim. The defendant was tried in March, 2001. Prior to the beginning of evidence, the defendant filed a motion in limine asking the court to establish certain procedures for determining the admissibility of evidence concerning his prior convictions and prior or subsequent uncharged misconduct. The court heard arguments outside the presence of the jury. The state presented the court with the defendant's extensive criminal record and indicated that it wanted to introduce into evidence, for impeachment purposes, the defendant's 1986 conviction on two counts of burglary in the second degree. The defendant had been arrested in 1985 and convicted in 1986. He was incarcerated for the crimes and released from prison on February 13, 1989.

In response, the defendant argued that he had a criminal record, but that since the 1986 conviction, he had changed his life and had not been convicted of a felony since 1986. Furthermore, the defendant argued that the court should apply the ten year rule[13] and exclude the conviction because he had been released from prison more than ten years ago. The state countered by arguing that the ten year rule did not apply in this case because the defendant had been released from prison in Febru-

---

[13] "While leaving the matter to the general discretion of the trial court, we have sanctioned a general guideline for the determination of remoteness that parallels rule 609 (b) of the Federal Rules of Evidence. Rule 609 (b) establishes a ten year limitation from conviction or release from resulting confinement upon the use of the conviction for impeachment purposes unless the probative value of the conviction substantially outweighs its prejudicial effect." *State* v. *Sauris*, 227 Conn. 389, 409–10, 631 A.2d 238 (1993).

ary, 1989, and that the incident at issue here occurred on February 28, 1998, a span of fewer than ten years. The court granted the defendant's motion in limine as to certain prior convictions and uncharged misconduct because they were legally remote, except the defendant's 1986 conviction for burglary. The court agreed with the state that because the defendant had been released from prison in 1989, the conviction was within nine years of the assault alleged in this case. The court found that the burglary conviction involved the underlying crime of larceny, which concerns truth and veracity, and that the evidence was more probative than prejudicial. On direct examination, the defendant admitted that he had been convicted of a felony in 1986. On cross-examination, the prosecutor inquired in greater detail as to the number of convictions and the type of felony.

On appeal, the defendant argues that the mandatory ten year rule codified in rule 609 (b) of the Federal Rules of Evidence has been recognized as the "general guideline for the determination of remoteness . . . ." (Internal quotation marks omitted.) *State* v. *Webb*, 37 Conn. App. 722, 732, 657 A.2d 711, cert. denied, 234 Conn. 915, 660 A.2d 357 (1995). The defendant also argues that the court used the wrong terminal date when calculating the ten year rule for legal remoteness. Pursuant to his understanding of the method of calculating remoteness enunciated in *State* v. *Nardini*, 187 Conn. 513, 522, 447 A.2d 396 (1982), and § 6-7 of the Connecticut Code of Evidence, the defendant contends that evidence of his 1986 burglary conviction was prejudicial in the face of the changes that he had made in his life, was unrelated to truthfulness and legally remote.

The state argues that the court did not abuse its discretion in admitting the evidence of the defendant's 1986 felony conviction and did not miscalculate the span of time. It also argues that the defendant was not prejudiced by the admission of the evidence because

burglary and assault are dissimilar crimes. In addition, the defendant's conviction was related to veracity because the crime underlying the burglary conviction was larceny. Finally, the state argues that the court gave a limiting instruction that the jury could use the evidence of the defendant's felony conviction only to determine credibility.[14]

"It is well settled that evidence that a criminal defendant has been convicted of crimes on a prior occasion is not generally admissible. . . . There are, however, several well recognized exceptions to this rule, one of which is that [a] criminal defendant who has previously been convicted of a crime carrying a term of imprisonment of more than one year may be impeached by the state if his credibility is in issue. . . . In its discretion a trial court may properly admit evidence of prior convictions provided that the prejudicial effect of such evidence does not far outweigh its probative value. . . . [Our Supreme Court] has identified three factors which determine whether a prior conviction may be admitted: (1) the extent of the prejudice likely to arise; (2) the significance of the commission of the particular crime in indicating untruthfulness; and (3) its remoteness in time. . . . A trial court's decision denying a motion to exclude a witness' prior record, offered to attack his credibility, will be upset only if the court abused its discretion." (Citations omitted; internal quotation

---

[14] In addition, the state boldly argued that due to the lack of judicial resources in the judicial district, the state was prevented from trying the defendant earlier and should not be penalized for the delay. In its brief on appeal, the state again asked that the absence of judicial resources in the Bristol courthouse be considered in determining the legal remoteness of the defendant's conviction. In his reply brief, the defendant strenuously objected to that argument, and rightly so. First, we note that there is no evidence in the record to support the state's contention. Second, the state has provided this court with no legal authority to support its argument, and we know of none. See Conn. Code Evid. § 6-7 (a). We have not considered that aspect of the state's argument except to dismiss it.

marks omitted.) *State* v. *Banks*, 58 Conn. App. 603, 615–16, 755 A.2d 279, cert. denied, 254 Conn. 923, 761 A.2d 755 (2000). Those three factors have been incorporated in Connecticut's code of evidence. Conn. Code Evid. § 6-7 (a).[15]

"The trial court, because of its intimate familiarity with the case, is in the best position to weigh the relative merits and dangers of any proffered evidence. . . . This principle applies with equal force to the admissibility of prior convictions. . . . General Statutes § 52-145 (b) provides that [a] person's interest in the outcome of the action or his conviction of crime may be shown for the purpose of affecting his credibility." (Citations omitted; internal quotation marks omitted.) *State* v. *Bailey*, 32 Conn. App. 773, 782–83, 631 A.2d 333 (1993).

In reaching our decision, we have considered the evidence and each of the factors set forth in § 6-7 of our code of evidence. The defendant has argued that in the face of his changed life, evidence of the 1986 conviction was greatly prejudicial to him because since 1986, he has not been in serious trouble with the law. While we acknowledge the circumstances of this case in that the defendant was responding to lawless behavior on his property, we do not agree that the prejudice to him was great.

"Although relevant, evidence may be excluded by the trial court if the court determines that the prejudicial effect of the evidence outweighs its probative value.

---

[15] Section 6-7 (a) of the Connecticut Code of Evidence provides: "General rule. For the purpose of impeaching the credibility of a witness, evidence that a witness has been convicted of a crime is admissible if the crime was punishable by imprisonment for more than one year. In determining whether to admit evidence of a conviction, the court shall consider:

"(1) The extent of the prejudice likely to arise,

"(2) the significance of the particular crime in indicating untruthfulness, and

"(3) the remoteness in time of the conviction."

. . . Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury. . . . The trial court . . . must determine whether the adverse impact of the challenged evidence outweighs its probative value." (Internal quotation marks omitted.) *State* v. *Pare*, supra, 75 Conn. App. 481.

By taking the witness stand, the defendant put his credibility into question. He testified last, and his version of what happened with the bat varied considerably from the testimony of Salmoiraghi and the other witnesses. "[B]y exercising his fifth amendment right to testify on his own behalf, it is axiomatic that a defendant opens the door to comment on his veracity. It is well established that once an accused takes the [witness] stand and testifies his credibility is subject to scrutiny and close examination. . . . A defendant cannot both take the [witness] stand and be immune from impeachment. . . . An accused who testifies subjects himself to the same rules and tests which could by law be applied to other witnesses." (Internal quotation marks omitted.) *State* v. *Beverly*, 72 Conn. App. 91, 99, 805 A.2d 95, cert. denied, 262 Conn. 910, 810 A.2d 275 (2002).

"[Our Supreme Court] has recognized that crimes involving larcenous intent imply a general disposition toward dishonesty or a tendency to make false statements. . . . [I]n common human experience acts of deceit, fraud, cheating, or stealing . . . are universally regarded as conduct which reflects on a [person's] honesty and integrity . . . ." (Internal quotation marks omitted.) *State* v. *Banks*, supra, 58 Conn. App. 616. "[T]here is no doubt that a prior conviction of burglary with larcenous intent bears on the credibility of the

defendant, particularly given the element of larcenous intent." *State* v. *Bailey,* supra, 32 Conn. App. 783.

The defendant is correct that the court used the wrong terminal date of the ten year rule by using the date of the crime committed here rather than the date of his testimony. "The probative value of a conviction in determining the credibility of a witness is related to the span of time between the conviction and the proffered testimony." *State* v. *Roman,* 6 Conn. App. 189, 191, 504 A.2d 529 (1986);[16] see also *State* v. *Askew,* 245 Conn. 351, 364–65 n.21, 716 A.2d 36 (1998) (declining to reconsider method of calculating age of conviction). We, however, cannot conclude that the court's error was of such great prejudicial effect that it outweighed the probative value of the evidence. "[C]onvictions having special significance on the issue of veracity may surmount the standard ten year bar . . . ." (Citation omitted.) *State* v. *Sauris,* 227 Conn. 389, 410, 631 A.2d 238 (1993).

In *Nardini,* our Supreme Court rejected the bright line, ten year test of the Federal Rules of Evidence in favor of a more flexible analysis. *State* v. *Nardini,* supra, 187 Conn. 526 (ten years "rough bench mark in deciding whether trial court discretion has been abused"). The drafters of our code of evidence incorporated the *Nardini* rationale in § 6-7. When considered with the other two factors of the test, we cannot say that the evidence of the defendant's 1986 conviction was more prejudicial than probative.

Our conclusion is consistent with other decisions of this court. "[A] prior conviction which is more than ten

---

[16] "Federal Rule of Evidence 609 (b) provides that evidence of a conviction is generally not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is later." *State* v. *Roman,* supra, 6 Conn. App. 192 n.2.

years old may, under some circumstances, retain some probative value which is minimally sufficient to overcome any marginal prejudice, and may be admissible, therefore, without a wholly unreasonable exercise of a trial court's discretion." (Internal quotation marks omitted.) *State* v. *Bailey*, supra, 32 Conn. App. 784 (sanctioning admission of 1979 burglary conviction in 1992 trial for sexual assault); see also *State* v. *Irving*, 27 Conn. App. 279, 290, 606 A.2d 17 (affirming conviction for 1989 sexual assault where court admitted evidence of defendant's 1978 robbery conviction), cert. denied, 222 Conn. 907, 608 A.2d 694 (1992); *State* v. *Kuritz*, 3 Conn. App. 459, 463, 489 A.2d 1053 (1985) (sixteen year old conviction for robbery admitted in case of risk of injury to child).

Furthermore, burglary and assault in the first degree are dissimilar crimes, and there was little chance of prejudice to the defendant in that regard. See *State* v. *Nardini*, supra, 187 Conn. 522 ("[w]here the prior crime is quite similar to the offense being tried, a high degree of prejudice is created and a strong showing of probative value would be necessary to warrant admissibility").

Under the circumstances, we cannot conclude that the court abused its discretion in admitting evidence of the defendant's 1986 conviction of two counts of burglary, where the underlying crime was larceny. The evidence was relevant to the defendant's credibility, and the court instructed the jury that it could use the evidence for that purpose only.

B

The defendant's second evidentiary claim is that the court improperly admitted an oral statement he made to a state police trooper in violation of his fifth amendment right to remain silent. We decline to review the defen-

dant's claim because it was not preserved, and the record is inadequate for our review.

At trial, on direct examination, Keegan, the arresting state trooper, testified that he asked the defendant what he was thinking and that the defendant replied that he could have killed Salmoiraghi. Keegan did not include the defendant's reply in his written report. Defense counsel briefly cross-examined Keegan about the defendant's reply and the written report. Keegan stated that he was trained to include all important information in a report and to file a supplemental report if something were excluded. Neither the prosecutor nor defense counsel queried Keegan about having advised the defendant of his constitutional rights commonly referred to as a *Miranda* warning.[17] The defendant did not file a motion to suppress his statement, object to the admission of Keegan's testimony or move the court to strike it. The defendant signed a notice of rights form on April 5, 1998, at 3:56 p.m. The record is otherwise silent as to whether the defendant signed the notice of rights form either before or after he made the statement to Keegan.

Because we do not know when the defendant signed the notification of rights form in relation to the statement at issue, the record is inadequate for review. See *State* v. *Berube*, 256 Conn. 742, 751, 775 A.2d 966 (2001) ("essential to know the timing of these conversations"). The appellant is responsible for providing an adequate record for our review. Practice Book § 60-5. In this instance, he has not done so and we, therefore, decline to review the defendant's claim.

### III

The defendant's last claim is that he was deprived of his constitutional right to a unanimous verdict. Specifi-

---

[17] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

cally, the defendant claims that two different crimes were charged in one count and that the jury's verdict is generalized as to guilt and therefore is not unanimous as to either crime. We disagree.

The following facts are relevant to the defendant's claim. The state charged the defendant with assault in the first degree in violation of § 53a-59 (a) (1) *and* (3) in a *one count* substitute information.[18] The court instructed the jury that there were two charges alleged in one count and that it should return a verdict on either § 53a-59 (a) (1) or § 53a-59 (a) (3). The court also instructed the jury that its verdict had to be unanimous.

The record discloses that the following occurred when the jury returned its verdict. The court informed the jury that it had received a note from the jury that a verdict had been reached, and instructed the jurors to follow the directions of and to respond to the court clerk.

"[Clerk]: Mr. Foreman, what say you . . . are you agreed upon a verdict in the case of state of Connecticut versus [the defendant]?

[18] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument; or (2) with intent to disfigure another person seriously and permanently, or to destroy, amputate or disable permanently a member or organ of his body, he causes such injury to such person or to a third person; or (3) under circumstances evincing an extreme indifference to human life he recklessly engages in conduct which creates a risk of death to another person, and thereby causes serious physical injury to another person . . . ."

The one count substitute information alleged in relevant part that "the [defendant], with intent to cause serious physical injury to another person, namely [Salmoiraghi], did cause such injury to [Salmoiraghi] by means of a dangerous instrument, to wit: a wooden object, in violation of Section 53a-59 (a) (1) of the Connecticut General Statutes, and . . . under circumstances evincing an extreme indifference to human life, the [defendant] recklessly engaged in conduct which created a risk of death to another person, namely [Salmoiraghi], and thereby caused serious physical injury to [Salmoiraghi] in violation of Section 53a-59 (a) (3) of the Connecticut General Statutes."

"[Foreman]: Yes, we have.

"[Clerk]: Mr. Foreman, what say you, is he guilty or not guilty of the crime of assault in the first degree in violation of § 53a-59a (a) (1)?

"[Foreman]: We find the defendant guilty involved, first degree."

The clerk then asked all of the jurors whether they had found the defendant guilty of the crime charged. All of the jurors responded affirmatively. As the court was about to excuse the jury, defense counsel asked to approach the bench, and the court held a sidebar conference. Defense counsel then asked the court to poll the jury. Thereafter, all of the jurors individually responded "guilty" to the clerk's question, "How do you find the defendant in this case?"

On appeal, the defendant claims that there is no certainty as to which of the two crimes of assault in the first degree he was convicted. The defendant asks that we review his claim pursuant to *Golding*, as his claim was preserved only minimally. We may dispose of a defendant's claim under *Golding* if any one of *Golding*'s four conditions is not satisfied. *State* v. *Vasquez*, 66 Conn. App. 118, 123, 783 A.2d 1183, cert. denied, 258 Conn. 941, 786 A.2d 428 (2001). Here, the claimed constitutional violation clearly did not exist because there is no ambiguity in the record as to the jury's verdict.

The court instructed the jury that the defendant was charged under two subdivisions of § 53a-59 and that its verdict had to be unanimous as to one of the subdivisions. The clerk asked the foreman how the jury found with regard to § 53a-59 (a) (1). The answer was guilty. All members of the jury panel agreed. Furthermore, the note to the court from the foreman of the jury informing the court that the jury had reached a verdict was marked as court exhibit one. The note stated: "All six of us is

in agreement of guilty of count I (one) assault—serious physical injury—first degree—53a-59 A 1 3/28/2001 [signed foreman]." We therefore conclude that the defendant was not deprived of his constitutional right to a unanimous verdict.

The judgment is affirmed.

In this opinion the other judges concurred.