# STATE OF CONNECTICUT *v.* TIMOTHY DUNCAN
## (AC 26079)

Gruendel, Lavine and Dupont, Js.

Argued April 21—officially released July 18, 2006

*Annacarina Del Mastro*, senior assistant public defender, for the appellant (defendant).

*Michele C. Lukban*, senior assistant state's attorney, with whom, on the brief, were *Walter D. Flanagan*, state's attorney, and *Warren C. Murray*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. The defendant, Timothy Duncan, appeals from the judgment of conviction, rendered after a jury trial, of conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134 (a) (2), interfering with an officer in violation of General Statutes § 53a-167a, carrying a pistol or revolver without a permit in violation of General Statutes § 29-35 (a) and alteration of a firearm identification mark or number in violation of General Statutes § 29-36. The defendant was given a total effective sentence of five years in prison. On appeal, the defendant claims (1) that his

conviction was not supported by evidence beyond a reasonable doubt, (2) that the court improperly admitted a written statement pursuant to *State* v. *Whelan*, 200 Conn. 743, 745–55, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), and (3) that the court improperly charged the jury as to the elements of § 29-36. We affirm the judgment of the trial court.

A review of the transcript reveals that the jury reasonably could have found the following facts. On August 8, 2003, and for some time prior thereto, Christopher Dufel resided in the third floor apartment at 8 Farview Avenue in Danbury. Devin McGlothlin was Dufel's former roommate, having resided at that address for several months prior to the date in question. McGlothlin knew that Dufel was a reputed drug dealer.

The defendant was friendly with Jason Austin, Tom Rodriguez and Rodney Gabel. On the evening of August 8, 2003, the defendant, Austin and Rodriguez had dinner at the Gabel home in Danbury. The defendant drove a dark green, four door automobile. At about 10 p.m., McGlothlin and his girlfriend, Kathleen O'Brien, went to Dufel's apartment to watch a video. O'Brien drove her car, which she parked on the street in front of the house next door to Dufel's apartment. At approximately 11:30 p.m., O'Brien and McGlothlin left Dufel's apartment and got into O'Brien's vehicle. O'Brien was in the driver's seat, and McGlothlin was in the passenger's seat. Almost immediately after they got into the vehicle, O'Brien testified, "a black kid . . . and two Spanish kids" approached them. One of the young men was on O'Brien's side of the vehicle, and the other two were on McGlothlin's side. The young men told O'Brien and McGlothlin to open the car windows, which O'Brien and McGlothlin initially refused to do. In response to their refusal, the defendant lifted his shirt to reveal a gun in his waistband. O'Brien and McGlothlin opened

the windows. One of the young men took O'Brien's cellular telephone, and the others ordered McGlothlin to get out of the car. When he got out of the car, McGlothlin recognized the defendant, a person with whom he had been acquainted years before. McGlothlin also recognized Rodriguez. The defendant, McGlothlin and Rodriguez walked toward 8 Farview Avenue. Austin stayed with O'Brien, identified himself as an undercover police officer and asked if there was any marijuana in the car. She told him there was not. Austin then searched several items in the backseat of O'Brien's car.

The defendant and Rodriguez told McGlothlin to use McGlothlin's cellular telephone to call Dufel and ask him to let them into Dufel's apartment. Dufel answered the call, but refused to open the door. Dufel looked out his window, saw the group of men and then dialed 911 to call the police. In the meantime, one of the young men had signaled to another person to approach. A fourth man appeared and walked by O'Brien's car toward the group in front of 8 Farview Avenue. McGlothlin recognized the fourth man as Nicholas Cipolla, a former classmate from Abbott Technical High School in Danbury.

Within two minutes of Dufel's having called the police, the first officer arrived in a marked police vehicle. Someone called out, "the cops," and the four young men ran away. As they ran, O'Brien saw the defendant remove the gun from his waistband. She heard the gun drop and later directed police to it. Three of the men ran in one direction, but Cipolla went in another toward the parking lot of a nearby condominium. Other officers who had responded to the bulletin that a robbery was in progress drove on an adjacent street and stopped Cipolla in the parking lot. O'Brien and McGlothlin later identified Cipolla as one of men who had accosted them.

Cipolla was arrested and taken to the police station where he gave the police a written statement about a plan to rob Dufel.[1] Cipolla implicated the defendant in the statement. One month later, McGlothlin selected the defendant from a photographic array as the man with the gun.

When Cipolla was arrested, he was carrying a set of keys. He told Craig Martin, a detective with the Danbury police department, that one of the keys was the key to the defendant's automobile, which the group had driven to a parking lot near Dufel's apartment. In order to identify the car, the police searched the parking lot looking for vehicles with warm hoods, indicating that the vehicle had been operated recently. They recorded the license numbers of the vehicles with warm hoods and used them to identify the owners of the vehicles. The police also used the motor vehicle records to search for the defendant's address. The defendant's address matched the address of the registrant of one of the vehicles with a warm hood. The registrant of the vehicle was George Laham, the defendant's stepfather.

Several months later, Martin asked Laham to voluntarily bring the vehicle to the police station and that the defendant accompany him. At the police station, Laham gave Martin permission to determine whether the key that had been in Cipolla's possession would open the vehicle. The key opened the vehicle.

Police ballistics experts determined that the gun that the defendant was carrying was an operable firearm and that the identification numbers had been drilled off of it. The defendant did not have a permit to carry a gun. The defendant subsequently was arrested, tried and convicted.

---

[1] At the time the police responded to his call for assistance, Dufel gave the police permission to enter and search his apartment. The police found no contraband in the apartment.

I

The defendant first claims that there was insufficient evidence to convict him of the crimes of (1) interfering with an officer, (2) conspiracy to commit robbery in the first degree, (3) carrying a pistol without a permit and (4) alteration of a firearm identification mark or number.[2] We disagree.

"In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [trier of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . This does not require that each subordinate conclusion established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because [our Supreme Court] has held that a [trier's] factual inferences that support a guilty verdict need only be reasonable." (Internal quotation marks omitted.) State v. Farnum, 275 Conn. 26, 32, 878 A.2d 1095 (2005).

"In conducting our review, we are mindful that the finding of facts, the gauging of witness credibility and the choosing among competing inferences are functions within the exclusive province of the jury, and, therefore, we must afford those determinations great deference."

---

[2] At trial, the defendant made oral motions to dismiss the charges against him and for a judgment of acquittal. The motions were denied by the court.

*State* v. *Conde,* 67 Conn. App. 474, 490, 787 A.2d 571 (2001), cert. denied, 259 Conn. 927, 793 A.2d 251 (2002).

### A

The defendant claims that the state failed to prove that he intended to hinder a police officer while in the performance of his duties. More specifically, the defendant argues that because the police had not arrived at the scene at the time he ran away, let alone had ordered him to stop, as in *State* v. *Hampton,* 66 Conn. App. 357, 375, 784 A.2d 444, cert. denied, 259 Conn. 901, 789 A.2d 992 (2001), he could not be guilty of interfering with an officer. In the defendant's view, because there was no evidence that he knew that the police had arrived or that he fled because the police were present, there was no evidence of his intent to hinder the police in the performance of their duties. We are unpersuaded by the defendant's argument.

The defendant was convicted of the offense of interfering with an officer under § 53a-167a (a), which provides in relevant part: "A person is guilty of interfering with an officer when such person obstructs, resists [or] hinders . . . any peace officer . . . in the performance of such peace officer's . . . duties." The state alleged in the long form information, among other things, that the defendant interfered with officers in the performance of their duties "by fleeing and discarding evidence of a crime while in flight."

"This court has stated that . . . § 53a-167a . . . defines interfering to *include* obstruction, resistance, hindrance or endangerment. . . . By using those words it is apparent that the legislature intended to prohibit *any* act which would amount to meddling in or hampering the activities of the police in the performance of their duties. . . . In enacting § 53a-167a, the legislature sought to prohibit behavior that hampers the activities of the police in the performance of their

duties. . . . The statute's purpose is to ensure orderly compliance with the police during the performance of their duties; any act intended to thwart this purpose violates the statute. . . . To hinder is defined as to make slow or difficult the course or progress of." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Silva*, 93 Conn. App. 349, 363–64, 889 A.2d 834 (*Dranginis, J.*, dissenting), cert. granted on other grounds, 277 Conn. 931, 896 A.2d 103 (2006).

"It is well established that the question of intent is purely a question of fact. . . . Intent may be, and usually is, inferred from the defendant's verbal or physical conduct. . . . Intent may also be inferred from the surrounding circumstances. . . . The use of inferences based on circumstantial evidence is necessary because direct evidence of the accused's state of mind is rarely available. . . . Intent may be gleaned from circumstantial evidence such as the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading up to and immediately following the incident. . . . Furthermore, it is a permissible, albeit not a necessary or mandatory, inference that a defendant intended the natural consequences of his voluntary conduct." (Citation omitted; internal quotation marks omitted.) *State* v. *Porter*, 76 Conn. App. 477, 487–88, 819 A.2d 909, cert. denied, 264 Conn. 910, 826 A.2d 181 (2003).

The jury heard testimony that as a marked police car approached 8 Farview Avenue someone yelled, "the cops," and the defendant and his coconspirators ran from the scene. O'Brien heard a gun drop as the defendant ran by her vehicle. The jury reasonably could have inferred from those factual circumstances that the defendant intended to hinder or to make difficult the duties of the police who were responding to a report of a robbery by fleeing and discarding the gun that had

been in his waistband. The defendant's claim therefore lacks merit.

## B

The defendant claims that the jury reasonably could not infer that he had conspired to commit robbery in the first degree because such an inference required the jury to stack inference on inference to reach that conclusion. In the defendant's view, the only evidence of a conspiracy was Cipolla's written statement, which he claims was improperly admitted into evidence; see part II. We disagree. The jury reasonably could have inferred from the testimony of O'Brien and McGlothlin that the defendant, Austin and Rodriguez behaved in a manner that reflected a plan to gain entry to Dufel's apartment to obtain drugs.

The long form information alleged in part that the defendant "agreed with one or more persons to commit the crime of [r]obbery in the [f]irst [d]egree and that at least one participant in the conspiracy committed an overt act in the furtherance of the conspiracy. The intended objective of this conspiracy was the robbery of . . . Dufel." "To sustain a conviction under § 53a-48 (a), the state needs to prove beyond a reasonable doubt (1) that a defendant intended that conduct constituting a crime be performed, (2) that he agreed with one or more persons to engage in or cause the performance of such conduct. . . . While the state must prove an agreement, the existence of a formal agreement between the conspirators need not be proved because [i]t is only in rare instances that conspiracy may be established by proof of an express agreement to unite to accomplish an unlawful purpose. . . . [T]he requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts."

(Citations omitted; internal quotation marks omitted.) *State* v. *Davis*, 68 Conn. App. 794, 798–99, 793 A.2d 1151, cert. denied, 260 Conn. 920, 797 A.2d 518 (2002).

General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 . . . he . . . (2) is armed with a deadly weapon . . . ." General Statutes § 53a-133 provides in relevant part that a person commits robbery "when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another for the purpose of . . . (2) compelling the owner of such property . . . to deliver up the property or to engage in other conduct which aids in the commission of the larceny." General Statutes § 53a-119 defines a larceny as "when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner." See *State* v. *Perez*, 78 Conn. App. 610, 645 n.14, 828 A.2d 626 (2003), cert. denied, 271 Conn. 901, 859 A.2d 565 (2004).

"[P]roof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty. . . . Furthermore, [i]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . it is not one fact, but the cumulative impact of a multitude of facts which

establishes guilt in a case involving substantial circumstantial evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Merriam*, 264 Conn. 617, 629, 835 A.2d 895 (2003).

The crux of the defendant's claim is that there was no direct evidence of a conspiracy, save Cipolla's statement, and that the jury had to bootstrap one inference on another to find beyond a reasonable doubt that he was guilty of conspiracy to commit robbery in the first degree. We do not agree.

"It is the jury's function to draw whatever inferences it deems reasonable and logical. . . . The jury, however, may not pluck these inferences from the ether. There must be sufficient evidence to support the inferences, otherwise they are not *reasonable* inferences and cannot support a conviction. . . . Once an inference has been reasonably found, it can be used as the basis for further inference." (Citations omitted; emphasis in original.) *State* v. *Smith*, 36 Conn. App. 483, 487, 651 A.2d 744 (1994) (reviewing sufficiency of evidence claim in appeal from conspiracy conviction), cert. denied, 233 Conn. 910, 659 A.2d 184 (1995).

The trial transcript discloses that in addition to Cipolla's statement about Dufel and drugs, McGlothlin testified on cross-examination that Dufel was a reputed drug dealer. The transcript further discloses that on the night of August 8, 2003, the defendant, Austin and Rodriguez were together. They walked along Farview Avenue and acted in concert to surround O'Brien's car after she and McGlothlin had exited Dufel's apartment. When O'Brien and McGlothlin refused to open the windows of the car, the defendant raised his shirt to reveal that he had a gun. The defendant and his accomplices were focused on getting into Dufel's apartment at 8 Farview Avenue and, to that end, the defendant and Rodriguez compelled McGlothlin to call Dufel on a cellular telephone

to ask him to open the door. Furthermore, Austin asked O'Brien if she had marijuana in her car, and he searched the contents of the backseat. When the police arrived on the scene, the defendant and his accomplices fled. Cipolla, who had the key to the defendant's vehicle, ran to a nearby parking lot. The defendant's vehicle was parked in the lot and had a warm hood. The gun that the defendant displayed was a deadly weapon because it was operable.

On the basis of the testimony alone, even without Cipolla's written statement, the jury reasonably could have found that the defendant, Austin and Rodriguez planned to gain entry into Dufel's apartment by clandestine means in order to rob him and that they fled when the police arrived. Cipolla told the police that the purpose of the young men's going to 8 Farview Avenue was to rob Dufel of money or drugs. This motive is supported by McGlothlin's testimony that Dufel was a reputed drug dealer and by Austin's having asked O'Brien if there were marijuana in her car.

For the foregoing reasons, we conclude that there was sufficient evidence from which the jury reasonably could have found beyond a reasonable doubt that the defendant and his accomplices had conspired to rob Dufel and that the defendant displayed a deadly weapon.

## C

The defendant claims that there was insufficient evidence that he was in possession of the pistol that was recovered at the crime scene and, therefore, he could not be guilty of carrying a pistol without a permit or of alteration of a firearm identification mark or number. The evidence is to the contrary. Because the defendant's conviction of both crimes turns on the element of possession, we will address his claims together.

The state charged, in part, that the defendant at the time and place in question "did carry on his person a pistol or revolver without a permit" in violation of § 29-35 (a)[3] and "did possess a firearm with a defaced identifying marker or number" in violation of § 29-36 (a).[4] "To obtain a conviction under § 29-35, the prosecution need prove only that the accused (1) carried a pistol while outside a dwelling or place of business and (2) that he did not have a permit to do so." *State* v. *Bradley*, 39 Conn. App. 82, 90, 663 A.2d 1100 (1995), cert. denied, 236 Conn. 901, 670 A.2d 322 (1996). "Section 29-35 . . . specifically refers to 'upon his person,' thus the pistol must be within the defendant's control or dominion in a public area." *State* v. *Hopes*, 26 Conn. App. 367, 375, 602 A.2d 23, cert. denied, 221 Conn. 915, 603 A.2d 405 (1992). The controlling statute and case law permit the jury to infer that a person in possession of a pistol or revolver on which the identifying marks have been defaced is the person who defaced the same. *State* v. *Francis*, 246 Conn. 339, 352–56, 717 A.2d 696 (1998); *State* v. *Turner*, 62 Conn. App. 376, 393, 771 A.2d 206 (2001).

Both O'Brien and McGlothlin testified that when the defendant was standing next to O'Brien's car on a public street, the defendant displayed a gun on his person. The core of the defendant's claim is that, at trial, O'Brien first testified that she heard the gun drop as the men

[3] General Statutes § 29-35 (a) provides in relevant part: "No person shall carry any pistol or revolver upon his or her person, except when such person is within the dwelling house or place of business of such person, without a permit to carry the same issued as provided in section 29-28. . . ."

[4] General Statutes § 29-36 (a) provides: "No person shall remove, deface, alter or obliterate the name of any maker or model or any maker's number or other mark of identification on any firearm as defined in section 53a-3. The possession of any firearm upon which any identifying mark, number or name has been removed, defaced, altered or obliterated shall be prima facie evidence that the person owning or in possession of such firearm has removed, defaced, altered or obliterated the same."

ran past her vehicle when the police arrived. She was five feet away from where the gun was dropped and later directed the police to the area where the gun was recovered. O'Brien was then questioned about the written statement that she gave to the police immediately after the incident. The prosecutor asked her if she had indicated in her statement that the defendant had reached into his waistband before throwing the gun. O'Brien could not remember making that statement. After her memory was refreshed by reading the statement, O'Brien testified as follows:

"[The Prosecutor]: After having read it, do you now remember whether or not you indicated if the black male took—[5]

"[The Witness]: Yes.

"[The Prosecutor]:—the gun from his waistband and threw it?

"[The Witness]: Yes, I do.

"[The Prosecutor]: Is that what happened?

"[The Witness]: I mean, if I said it that night, then I would guess that's what happened. It has been a while, so, I can't—but if I said it that night, then obviously I would think that that's what happened."

The defendant claims that there is a lack of credible evidence that he threw the gun that the police recovered from the scene. O'Brien and McGlothlin both testified that the defendant had a gun in his waistband. O'Brien, who testified from memory, did not say that she saw the defendant remove the gun from his waistband. When shown the statement she gave to the police, O'Brien indicated that because the event had just occurred when she talked to the police, her statement was accurate. The issue for the jury to decide, whether O'Brien saw

---

[5] The defendant is an African-American.

the defendant discard the gun, was a question of credibility.

We conclude, on the basis of our review of the transcript and the relevant legal principles, that there was sufficient evidence for the jury to have decided that the defendant was in possession of the pistol that was recovered at the crime scene.

## II

The defendant's second claim is that the court abused its discretion in admitting the written statement that Cipolla gave to police for substantive purposes under *State* v. *Whelan*, supra, 200 Conn. 745–55. In *Whelan*, our Supreme Court adopted "a rule allowing the substantive use of prior written inconsistent statements, signed by the declarant, who has personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross-examination." Id., 753. Here, the defendant claims that the state failed to demonstrate that Cipolla was "sufficiently" available for cross-examination and that he had personal knowledge of the contents of the statement. He also argues that if this court disagrees with his *Whelan* claims, the admission of Cipolla's written statement denied him the constitutional right to cross-examine witnesses against him. The state argues that the defendant's availability claim is unpreserved and that the claim that Cipolla lacked personal knowledge is inadequately briefed and, for those reasons, we should not review the claims. The state also argues that the defendant was not denied the constitutional right to cross-examine Cipolla. We conclude that the court did not abuse its discretion in admitting Cipolla's written statement pursuant to *Whelan* and that the defendant was not denied the constitutional right to cross-examine the witness.

The state called Cipolla, who initially testified that he vividly remembered the night of August 8, 2003. He

testified that he and a group of his friends whom he identified by name drove to a parking lot near Farview Avenue but that he did not remember what time it was. When the prosecutor asked Cipolla for more specific details, he could not remember more than that the event had occurred the previous summer. He testified that he went to the police station and gave a statement but that he could not remember details because the incident "was kind of blank in [his] mind . . . ." Until prompted by the prosecutor, Cipolla could not recall that he had reviewed his statement about a robbery involving the defendant and Austin one week before trial. Cipolla could recall, however, that he had given a written statement and that he had signed it. After Cipolla's statement was marked for identification and he had read it, the prosecutor asked Cipolla if he was familiar with the events of August 8, 2003. Cipolla responded: "I mean, I'm familiar with what I'm reading right now, but I can't really remember what happened that night. I mean, I read—I'm reading what I wrote down. . . . But it's kind of blank in my mind how it actually happened that night." Cipolla testified that at the time he gave the statement, the events were fresh in his mind, and he was nervous and under a lot of pressure due to all of the questions that he was asked. The state then offered to place Cipolla's statement in evidence pursuant to *Whelan*.

Defense counsel objected to the statement, claiming that it was not the best evidence and that the state failed to meet the third prong of *Whelan* because it had failed to prove that the statement was reliable at the time it was given. The defendant also objected to the admission of hearsay within the statement. The jury was excused, and the state called Martin to testify about the circumstances under which he took Cipolla's statement.

According to Martin, Cipolla, who had been advised of his rights under *Miranda*,[6] was a cooperative and willing witness who provided information about the planning of the crime, the parties involved, the vehicle involved and what happened. Cipolla appeared to be lucid and not under the influence of drugs or alcohol when he gave his statement. He was no more anxious than others in a similar situation. When they arrested Cipolla, the police found the keys to the defendant's car in Cipolla's possession.

The defendant further objected that although Cipolla's statement had been sworn to in front of Sergeant Randy Salazar, it had not been witnessed by two people. The court overruled the defendant's objection, stating that Cipolla's statement satisfied the *Whelan* criteria. The statement is in writing, Cipolla testified that he had personal knowledge of the facts in the statement, had signed it and was available for cross-examination. The court also found that the statement was trustworthy, given the circumstances under which it was obtained. As to the hearsay statements contained in Cipolla's statement, they were admissible under *State* v. *Robertson*, 254 Conn. 739, 745–46, 760 A.2d 82 (2000) (well established that coconspirator's hearsay statement, made while conspiracy is ongoing and in furtherance of conspiracy, is exception to hearsay rule and does not violate confrontation clause; conspiracy does not necessarily end with commission of target crime).

When the jury returned, the court clerk read Cipolla's statement: "I know these three guys, Jason Austin, [the defendant], and Tom. They have been talking about trying to rob this kid named Chris Dufel. Dufel lives on Farview Ave[nue] and he is one of the biggest pot dealers in town. The word around town was that Dufel had fifty pounds of weed and a lot of money. A couple of

---

[6] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

days ago is when I first heard them talking about robbing Dufel. Tonight we got together and we were [going to] drive by [Dufel's] house and check it out. We drove over there in [the defendant's] car, I think it's a Galant. Tom was driving. We drove past the house and then went around the corner and parked the car in a condo parking lot. It's the same parking lot where I got arrested. They told me that they were [going to] go wait outside Dufel's house and see if he came outside. I waited in the car because I didn't want any part of it. After [a while] I saw Jason standing out in front of me waving at me to come over. I got out of the car and walked over to Farview Ave[nue]. When I got over in front of Dufel's house I saw Jason, [the defendant] and Tom with a kid I recognized from school named Devin. [The defendant] had a gun tucked into the right front of his pants. They were telling Devin to open the door to Dufel's house, but he said that he didn't have the key. Tom told Devin to call Dufel on the phone and open the door. Devin called Dufel on his cell phone, but Dufel had already looked out the window and saw everybody outside and wouldn't open the door. Tom even talked to Dufel on the phone and he still wouldn't open the door. While they were talking we saw the cops come around the corner. Everybody left and headed back towards the parking lot where the car was. That's where the cops got me."

The prosecutor then challenged Cipolla as to why he could not remember what happened on August 8, 2003. Cipolla testified that his life has changed and that he does not think about the incident. On cross-examination, Cipolla testified that he left Abbott Technical High School after three years because he did not like school and that he currently cut hair for a living. When asked how his life had changed since the time of the incident, he said: "I mean that I forgot about what happened that night. I try to block it out. You know what I mean? I

have a baby on the way. So, I'm not really trying to think about what happened."

Defense counsel also elicited that Cipolla may have been drinking beer before the incident, but that he did not take drugs. Cipolla further testified that he was nervous when he gave his statement to the police because he had pleaded guilty to larceny in the sixth degree, spent five and one-half months in prison and been released three months before the incident. He could not, however, recall the crimes with which he had been charged originally with respect to the incident on Farview Avenue or when he went to court to plead guilty to interfering with an officer. He stated, "I'm not going to say yes if I'm not sure." He had, in fact, been charged with conspiracy to commit larceny in the first degree and interfering with an officer. He pleaded guilty to interfering with an officer and was sentenced to one year of probation.

On cross-examination, Cipolla testified that the police did not tell him what to say when he gave his statement. Defense counsel questioned Cipolla about his long-term memory, to which he responded: "Yeah, I can't remember too good about things. I can't remember what I did yesterday." Cipolla testified that he has been diagnosed with attention deficit disorder. When he was four years old, he fell from a truck, striking his head and was in a coma for some time. Cipolla knew generally what happened on the night in question, but when pressed about the meaning of certain parts of his statement, he said, "Didn't I just say—I'm reading off of what I wrote on the statement right now. I told you guys I can't really remember what happened. You guys keep asking me and asking me, like—I mean . . . I'm just answering what I wrote down on the statement."

We review claims of evidentiary impropriety under the abuse of discretion standard. See, e.g., *State* v. *Spiegelmann*, 81 Conn. App. 441, 448, 840 A.2d 69, cert.

denied, 268 Conn. 921, 846 A.2d 882 (2004). At trial, the defendant objected to the admission of Cipolla's statement on the basis of reliability and hearsay.[7] To the extent that the defendant raises additional evidentiary claims on appeal, namely, violations of *Whelan*, the Connecticut Code of Evidence, the Federal Rules of Evidence and related cases, those claims are not reviewable, as it is well established that we do not review evidentiary claims raised for the first time on appeal. See, e.g., *State* v. *Charles*, 56 Conn. App. 722, 729, 745 A.2d 842, cert. denied, 252 Conn. 954, 749 A.2d 1203 (2000). The defendant asks that we review his claim that he was denied the constitutional right to an effective cross-examination of Cipolla pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[8] We will review the claim because the record is adequate for our review, and the claim is of a constitutional nature. The defendant cannot prevail, however, because our review shows that a constitutional violation did not clearly exist and he clearly was not deprived of a fair trial.

The defendant claims that Cipolla's written statement lacks reliability because the state failed to satisfy the personal knowledge prong of *Whelan*. The gist of his argument is that because the statement does not contain the source of Cipolla's knowledge, Cipolla lacked personal knowledge of the contents of the statement. The defendant's argument overlooks the substance of the statement, which was written as a first person account of what happened at 8 Farview Avenue on August 8 and 9, 2003. The jury reasonably could infer from the contents of the statement that Cipolla told the police what he knew because he was a participant or witnessed the events.

---

[7] The defendant has not pursued the hearsay objection on appeal.

[8] We review the defendant's claim under the federal constitution, as the defendant provided no analysis of his claim under the constitution of Connecticut.

Our Supreme Court has concluded that "the personal knowledge prong of the *Whelan* rule does not require that the declarant have witnessed the commission of the crime that is the subject of the prior inconsistent written or recorded statement. . . . [I]f the substance of the prior inconsistent statement of a witness is an admission made by the defendant to the witness, the witness has personal knowledge of that admission, within the meaning of *Whelan*. Thus, as long as the witness' statement meets the other requirements for admissibility under *Whelan*, and the words spoken by the defendant to the witness, as related in the witness' prior statement, would be admissible as an admission by the defendant if testified to by the witness, the personal knowledge prong of *Whelan* is satisfied." (Internal quotation marks omitted.) *State* v. *Pierre*, 277 Conn. 42, 59, 890 A.2d 474 (2006).

In *Whelan*, our Supreme Court noted that the hazards associated with reporting and use of prior oral statements at trial "is greatly lessened with respect to prior inconsistent written statements signed by the declarant . . . and indicated that, in such circumstances, the likelihood of fabrication is slight and the risk of coercion, influence or deception is greatly reduced. . . . Thus, [w]hile [our Supreme Court] noted that the requirement that prior statements be written and signed is not an absolute guaranty of reliability, it does provide significant assurance of an accurate rendition of the statement and that the declarant realized it would be relied upon." (Citations omitted; internal quotation marks omitted.) *State* v. *Mukhtaar*, 253 Conn. 280, 304–305, 750 A.2d 1059 (2000).

"[A] prior inconsistent statement that fulfills the *Whelan* requirements may have been made under circumstances so unduly coercive or extreme as to grievously undermine the reliability generally inherent in such a statement, so as to render it, in effect, not that

of the witness. In such circumstances, the trial court must act as a gatekeeper to ensure that the statement does not go to the jury for substantive purposes. [Our Supreme Court emphasized], however, that the linchpin of admissibility is reliability; the statement may be excluded as substantive evidence only if the trial court is persuaded, in light of the circumstances under which the statement was made, that the statement is so untrustworthy that its admission into evidence would subvert the fairness of the fact-finding process. In the absence of such a showing by the party seeking to exclude a statement that meets the *Whelan* criteria, the statement is admissible as substantive evidence; like all other evidence, its credibility is the grist for the cross-examination mill." Id., 306–307. When fulfilling its gatekeeping function, the trial court's findings of fact will not be disturbed on appeal unless they are clearly erroneous. Id., 307 n.26.

In this case, Martin testified as to the circumstances under which Cipolla gave his written statement, including the fact that Cipolla had been advised of his constitutional rights. Salazar witnessed the statement, which was signed by Cipolla and Martin. The defendant has presented no specific reason on appeal as to why the statement was unreliable. Cipolla admitted being nervous while he gave the statement, and undoubtedly he was anxious, especially given the fact that he recently had been released from prison. He testified that he received nothing in return for having made the statement. In his statement, Cipolla identified the young men who planned to rob Dufel and the motive. He also made an in-court identification of the defendant, whom he incriminated as a member of the conspiracy. The court's finding that the statement was reliable was not clearly erroneous, and therefore the court did not abuse its discretion in admitting Cipolla's statement.

The defendant's constitutional claim is that due to Cipolla's inability to remember, the defendant was not able to cross-examine Cipolla in a meaningful and effective way. We do not agree. Cipolla testified at trial, and the defendant cross-examined him. The circumstances presented by the defendant's cross-examination of Cipolla are similar to those recently addressed in *State* v. *Pierre*, supra, 277 Conn. 78–86, in which our Supreme Court held that the defendant was not denied the opportunity for effective cross-examination of a third party witness who could not recall his statement to police.

"[W]hen the declarant is available for cross-examination the jury has the opportunity to observe him as he repudiates or varies his former statement. The cross-examination to which a recanting witness will be subjected is likely to be meaningful because the witness will be forced either to explain the discrepancies between the earlier statements and his present testimony, or to deny that the earlier statement was made at all. If, from all that the jury sees of the witness, [it] conclude[s] that what he says now is not the truth, but what he said before, [it is] none the less deciding from what [it] see[s] and hear[s] of that person and in court. . . . The jury can, therefore, determine whether to believe the present testimony, the prior statement, or neither." (Internal quotation marks omitted.) *State* v. *Mukhtaar*, supra, 253 Conn. 303–304.

On the basis of our review of the Cipolla's testimony, his *Whelan* statement and the defendant's cross-examination of him, we conclude that the defendant was able to lay before the jury Cipolla's many shortcomings of memory and to attack his credibility. The court put no limitations on the scope of the defendant's cross-examination. "[T]he Confrontation Clause guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."

(Emphasis in original; internal quotation marks omitted.) See *United States* v. *Owens*, 484 U.S. 554, 559, 108 S. Ct. 838, 98 L. Ed. 2d 951 (1988); see also *Delaware* v. *Fensterer*, 474 U.S. 15, 21–22, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985). Furthermore, the United States Supreme Court has explained that "[a]s *Fensterer* demonstrates, that opportunity [for cross-examination] is not denied when a witness testifies as to his current belief but is unable to recollect the reasons for that belief. It is sufficient that the defendant has the opportunity to bring out such matters as the witness' bias, his lack of care and attentiveness, his poor eyesight, and even (what is often a prime objective of cross-examination . . .) the very fact that he has a bad memory. If the ability to inquire into these matters suffices to establish the constitutionally requisite opportunity for cross-examination when a witness testifies as to his current belief, the basis for which he cannot recall, we see no reason why it should not suffice when the witness' past belief is introduced and he is unable to recollect the reason for that past belief. In both cases the foundation for the belief (current or past) cannot effectively be elicited, but other means of impugning the belief are available." (Citation omitted.) *United States* v. *Owens*, supra, 559.[9]

In this case, the defendant had the opportunity to cross-examine Cipolla. It was for the jury to determine Cipolla's credibility and the weight to ascribe to the

---

[9] In *Owens*, a federal correctional officer attacked with a metal pipe suffered a fractured skull and memory impairment. At trial, the officer testified about the blows to his head and identified the defendant as his assailant. On cross-examination, he could not remember seeing his assailant at the time of the attack. *United States* v. *Owens*, supra, 484 U.S. 556. The issue in *Owens* was "whether either the Confrontation Clause of the Sixth Amendment or Rule 802 of the Federal Rules of Evidence bars testimony concerning a prior, out-of-court identification when the identifying witness is unable because of memory loss, to explain the basis for the identification." Id., 555–56. The court concluded that it did not.

statement that he gave to the police at the time of the incident. We therefore conclude that the defendant was not denied the right to cross-examine Cipolla within the limits of the constitutional guaranty.

## III

The defendant's third claim is that the court improperly instructed the jury on the elements of alteration of the identifying mark or number of a firearm and the application of the presumptive inference that the jury is permitted to draw. Because the defendant waived any claim as to the portion of the jury instruction at issue, he cannot prevail.

With respect to the crime of alteration of a firearm identification mark, the court instructed the jury as follows: "The state alleges that the defendant, on or before August 8, 2003, at a time prior to 11:30 p.m., defaced the mark of identification on a Lorcin [.38] caliber pistol. For you to find the defendant guilty of the charge, the state must prove, beyond a reasonable doubt, that the defendant defaced the pistol's mark of identification. For the purpose of determining whether the state has proven this essential element beyond a reasonable doubt, the possession of a firearm upon which any identifying mark has been defaced, it may be prima facie evidence that the person owning or in possession of the firearm has defaced the same. The phrase 'prima facie evidence' means evidence which— if you, ladies and gentlemen, give it credit—may be sufficient to establish the fact or facts which it is adduced to prove.

"There are two elements that the state must prove, and each must be proven beyond reasonable doubt. The first, that the defendant possessed a firearm. And second, during such possession of the firearm, it was found to have an identification marker defaced. The term 'firearm' means any weapon from which a shot

may be discharged. The term 'possess' means to have physical possession or otherwise exercise dominion or control over tangible property. The term 'deface' means to mar the external appearance of.

"*If you find that the state has proved beyond a reasonable doubt each of the elements of the crime of alteration of firearm identification mark or number, then you may find the defendant guilty.* On the other hand, if you find that the state has failed to prove beyond a reasonable doubt any one of the elements, you shall find the defendant not guilty." (Emphasis added.)

After the court gave its oral instruction, the prosecutor pointed out a discrepancy between the court's oral charge and the written charge that the court intended to submit to the jury. The written charge substituted the word *shall* for *may*, i.e., "If you find that the state has proved beyond a reasonable doubt each of the elements of the crime of alteration of firearm identification mark or number, then you *shall* find the defendant guilty." The court agreed that the word *may* should have been used in the written version of its charge. Both counsel agreed that the court used the word *may* in its oral charge. The court told counsel that the page containing the error would be retyped during the luncheon recess and the corrected page substituted in the written charge given to the jury. When court reconvened after the recess, the court asked both counsel if they had reviewed the corrected version of the written charge. Both the prosecutor and defense counsel stated that they were "satisfied" with the correction.

On appeal, the defendant claims that the court's instruction created a mandatory presumption, rather than a permissive presumption, which was held to be improper in *State* v. *Francis*, supra, 246 Conn. 354–55.[10]

[10] "A mandatory presumption instructs the jury that it *must* infer the presumed fact if the State proves certain predicate facts. A permissive inference suggests to the jury that a possible conclusion *may* be drawn if the State proves predicate facts, but does not require the jury to draw that

Basically, the defendant argues that there is no distinction between the meanings of the word *may* and *shall*. The defendant failed to raise his claim before the trial court by either submitting a request to charge as to the crime alleged or objecting to the oral instruction that was given. In fact, his counsel stated that he was "satisfied" with the corrected written charge that was submitted to the jury. On appeal, the defendant seeks to prevail pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40, contending that on the basis of the charge, the jury could have concluded that he had to rebut the permissive inference and improperly was led to believe that the law criminalized possession rather than defacing the identification mark or number. The state argues that the defendant cannot prevail under *Golding* because he waived any challenge to the alleged constitutional violation by responding to the court that he was satisfied with the written charge. The state's argument is in keeping with *State* v. *Cooper*, 38 Conn. App. 661, 667, 664 A.2d 773, cert. denied, 235 Conn. 908, 665 A.2d 903 (1995), cert. denied, 517 U.S. 1214, 116 S. Ct. 1837, 134 L. Ed. 2d 940 (1996), and its progeny.

In *State* v. *Arluk*, 75 Conn. App. 181, 191–92, 815 A.2d 694 (2003), the defendant, on appeal, claimed that the court's improper jury instruction relieved the state of its burden of proving an element of the crime. He did not preserve his claim at trial and sought to prevail under *Golding*. This court concluded, however, that the defendant implicitly had waived any claim as to the court's instruction. Id. "The court in *Arluk* relied on *State* v. *Cooper*, [supra, 38 Conn. App. 661], and stated that [w]e are mindful that in the usual *Golding* situation, the defendant raises a claim on appeal which, while not preserved at trial, at least was not waived at trial. . . . [In *Cooper*], we held that a defendant could not

conclusion." (Emphasis in original; internal quotation marks omitted.) *State* v. *Francis*, supra, 246 Conn. 354.

satisfy the third prong of *Golding* where he had implicitly waived at trial a challenge to the alleged constitutional deprivation that was the basis of his claim on appeal. Therefore, a defendant cannot prevail under *Golding* on a claim that he implicitly waived at trial. . . . *State* v. *Robinson,* 81 Conn. App. 26, 31, 838 A.2d 243, cert. denied, 268 Conn. 921, 846 A.2d 882 (2004); see *State* v. *Tate,* 59 Conn. App. 282, 285, 755 A.2d 984 (defendant must avail himself of the opportunity to make an objection and if he does not avail himself of the opportunity, he must be holden to a waiver of the objection . . .), cert. denied, 254 Conn. 935, 761 A.2d 757 (2000)." (Citation omitted; internal quotation marks omitted.) *State* v. *Sinvil,* 90 Conn. App. 226, 236–37, 876 A.2d 1237, cert. denied, 275 Conn. 924, 883 A.2d 1251 (2005).

Here, the defendant not only failed to object to the court's instruction, but also voiced satisfaction with it. "A defendant in a criminal prosecution may waive one or more of his or her fundamental rights." *State* v. *Cooper,* supra, 38 Conn. App. 669. "Although the state must ordinarily prove even the undisputed elements of the crime charged, it is not necessary that a defendant's waiver of that requirement be express." (Internal quotation marks omitted.) *State* v. *Arluk,* supra, 75 Conn. App. 193. To allow the defendant to seek reversal now that his trial strategy has failed would amount to allowing him to induce potentially harmful error, and then ambush the state with that claim on appeal. See id. A review of the record shows that, for these reasons, the defendant cannot satisfy the third prong of *Golding,* as the constitutional violation did not clearly exist.

The judgment is affirmed.

In this opinion the other judges concurred.