STATE OF CONNECTICUT *v.* ANTHONY VELEZ
(AC 29283)

Flynn, C. J., and Lavine and Dupont, Js.

Argued September 25, 2008—officially released March 24, 2009

*Alice Osedach*, assistant public defender, for the appellant (defendant).

*Melissa L. Streeto*, assistant state's attorney, with whom, on the brief, were *Scott J. Murphy*, state's attorney, and *Kevin J. Murphy*, senior assistant state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. On September 19, 2004, the defendant, Anthony Velez, stabbed the victim Willie Vines, who

died as a result of the wounds inflicted. The defendant admitted that he had stabbed the victim but denied that he had intended to kill him. The jury found the defendant guilty of murder in violation of General Statutes § 53a-54a, as well as burglary in the first degree in violation of General Statutes § 53a-101 (a) (2) and criminal mischief in the first degree in violation of General Statutes § 53a-115 (a) (1). On appeal, the defendant claims that (1) the trial court (a) inadequately answered the jury's question concerning the element of intent, (b) improperly instructed the jury with respect to intoxication and (c) improperly permitted the state to cross-examine him with regard to his prior convictions and (2) the prosecutor engaged in prosecutorial impropriety. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts on the basis of evidence presented. The defendant and the victim had a sexual relationship. Prior to moving to the first floor apartment at 144 Dwight Street in New Britain, the two men had lived together. The lease for the 144 Dwight Street apartment was in the victim's name. The defendant had a key to the apartment door but not the main entrance to the building, a three-story dwelling. He also received his mail at 144 Dwight Street. Tina Pereira owned the building and lived on the third floor.

According to the defendant, the victim was a bigger man than he was and was controlling and jealous. Although they got along well most of the time, the men engaged in verbal and physical fights during the course of their relationship. Their disputes often occurred because the defendant had looked at a woman or spoken with someone of whom the victim disapproved. Prior to his relationship with the victim, the defendant had been involved romantically with a woman who bore him a child.

The defendant has suffered from psychiatric problems since he was seven years old. Approximately one week before the incident, the defendant had been hospitalized following a suicide attempt. Various medications were prescribed for him, but he took them sporadically. At the time of the incident, the defendant claimed not to have taken his medicine for a number of days because he was trying to wean himself from them. The victim was skeptical of psychiatric medications and did not like the fact that the defendant took so many of them.

On the evening of September 18, 2004, the defendant and victim attended a wedding reception in New Britain and were seated at a table with the victim's cousin, Gwendolyn Robinson, who later recalled that the defendant had been drinking heavily. During the reception, the defendant danced with a woman, an act that caused the victim to become jealous and angry. After the victim threatened him, the defendant went outside, and the victim followed him. Robinson, who had gone outside for a cigarette, saw the victim kick the defendant and heard them arguing about a woman. Later, Robinson drove the victim home.

Although the victim told the defendant not to come home, the defendant walked to 144 Dwight Street. When he arrived, the front door of the building was locked. The defendant went to the bedroom window and asked the victim to unlock the door, but the victim would not let the defendant inside. For more than one hour, the two carried on an angry conversation from either side of the window. The defendant eventually broke the window with a rock. While the defendant was climbing through the window, the victim punched him in the head. The victim got a knife from the kitchen, but the defendant punched the victim, causing him to drop the knife. The victim then ran up the stairs. The defendant grabbed two kitchen knives and followed him. The victim stood outside the empty second floor apartment

calling for help. The defendant stabbed him quickly and dropped the knives. The victim ran down the stairs and outside.[1] The defendant returned to the first floor apartment.

According to the defendant, he did not know what had come over him, as he had no control of himself. He claimed that he was intoxicated, scared and going crazy. He broke things throughout the apartment. The defendant described himself as having had a psychotic episode during which he could not stop himself from doing things that he knew were wrong.

At approximately 1 a.m., Chiedza Rodriquez, who lived at 138 Dwight Street, heard people arguing loudly. She looked outside and saw a man explaining that the girl he was dancing with was a lesbian. Rodriquez believed that the man was in the midst of a lovers' quarrel. Later, Rodriquez heard breaking glass. From her kitchen window, she saw the defendant climbing through a broken window. She heard screaming and called the police. While she was on the telephone, she saw the victim leave 144 Dwight Street holding his side.

Pereira was in her third floor apartment at approximately 12:10 a.m. when she heard the defendant yelling. As she closed her window, she heard the defendant ask the victim to let him inside. The defendant continued to plead for approximately thirty minutes, becoming progressively more agitated and frustrated. When she heard a crash, she dialed 911. Pereira heard someone run up the stairs and shortly afterward heard the victim call for help. Not long thereafter, Pereira heard the defendant calling from the first floor window that he had a bomb in the microwave and that he was going

---

[1] The defendant had stabbed the victim once in the right flank and arm and three times in the center of the back, puncturing the right and left chest cavities and the left lung. The injuries compromised the victim's ability to breathe and caused internal bleeding, which led to his death at a hospital.

to blow up the building. She left her apartment and went out to the street. She saw that the victim, whose shirt was covered with blood, was having difficulty breathing. Pereira heard the defendant screaming that he was going to commit suicide.

Kim Black lived at 148 Dwight Street and had worked as a bartender at the previously mentioned wedding reception, where she had served the defendant and the victim alcoholic beverages. When Black arrived home, she heard breaking glass. As she was walking up the steps to her home, Black heard someone call for help. She, too, dialed 911.

Gregory Tartaglia, a New Britain police officer, was dispatched to 144 Dwight Street at approximately 2:34 a.m. pursuant to a report of a disturbance and a stabbing. When Tartaglia arrived at the scene, he saw the heavily bleeding victim in the parking lot across the street from his home. The victim identified the defendant as the person who had stabbed him. When Tartaglia looked at him, the defendant stated: "That's right. I stabbed him. I stabbed him." As the officer approached the defendant, who was standing by the kitchen window, the defendant told Tartaglia not to come any closer, as he, the defendant, had not taken his medication. The defendant also threatened to slit his wrists. Tartaglia continued to approach the defendant who then told the officer that he had a bomb in the microwave and was going to blow up the house. Tartaglia stopped and waited for other officers to arrive.

According to Tartaglia, when Sergeant Allan Raynis arrived, Raynis spoke to the defendant, and Tartaglia was able to go to the back of the house and observe the defendant throwing things about the kitchen.[2] When the defendant moved into the bedroom, Officer Marcus

---

[2] According to Pereira, the defendant caused more than $2300 in damage to the fixtures, floors and walls of the apartment.

Burrus was able to immobilize the defendant with a Taser gun through the broken window. Burrus entered the apartment through the broken window and heard the defendant state: "I got [the victim] first." After the defendant was arrested, he admitted to the officers that after the victim had locked him out, he broke in and stabbed the victim in the back three or four times. The defendant explained to the police that he wanted the victim to remember forever who left the scars on his back. He stated, "that motherfucker felt it real good and I'm proud of it." He also bragged about destroying $20,000 worth of the victim's personal property. The defendant recognized that he would be going to jail or a mental institution for a long time due to his conduct.

At trial, the defendant testified and asserted two theories of defense: when he killed the victim, (1) he had acted under extreme emotional disturbance or (2) he was too intoxicated to form the specific intent needed to be found guilty of murder. The jury found the defendant guilty, and the court imposed an effective sentence of sixty years incarceration. The defendant appealed.

I

The defendant's first claim is that the court deprived him of his constitutional right to due process and a fair trial by failing to answer adequately a question from the jury or to correct the jury's misunderstanding regarding the element of intent. The state contends that the defendant's claim is not reviewable because defense counsel waived any such claim by agreeing to the instruction the court gave the jury in response to its question. We agree with the state.

The following facts are relevant to the defendant's claim. During its charge, the court instructed the jury on murder and intent, among other things. The court stated in part that "[a] person is guilty of murder when, with intent to cause the death of another person, he causes the death of another person. For you to find the

defendant guilty of this charge, the state has the burden to prove beyond a reasonable doubt the following two elements: one, that the defendant had the specific intent to cause the death of another person and, two, acting with that intent, the defendant caused the death of that person.

"Let's talk about element one, intent. As to the first element, the state must prove beyond a reasonable doubt that the defendant had the specific intent to cause the death of [the victim]. The state must prove beyond a reasonable doubt that the defendant, in causing the death . . . of the other person, did so with the specific intent to cause the death of another person; in other words, that the defendant's conscious objective was to cause the death of [the victim]."[3] After the court

[3] The court's charge on the element of intent continued: "There is no particular length of time necessary for the defendant to have formed his specific intent. Intent may be formed in seconds; actually, in a brief instant before commission of the act. However, it is necessary for the intent to be formed prior to or during the act resulting in the commission of the crime.

"Now, as it relates to intent. Intent relates to the condition of the mind of the person who commits the act, his purpose in doing it. As defined by law, a person acts intentionally with respect to result when his conscious objective is to cause such result. Intentional conduct is purposeful conduct, rather than conduct that is accidental or inadvertent. Intent is a mindful process.

"What a person's purpose or intention has been is a matter to be largely determined by inference. A person's intent may be proven by direct or circumstantial evidence. Because direct evidence of the defendant's state of mind is rarely available, intent is generally proven by circumstantial evidence. The only way a jury can determine what a person's intention was at any given time, aside from that person's own testimony, is by circumstantial evidence. You may or may not believe that testimony according to whether or not you find it worthy of belief.

"Here, the defendant testified. You may, of course, consider what the defendant said about his intent. You can accept or reject that testimony in accordance with the instructions I have given you on credibility, including that of the defendant. The defendant has no burden to prove a lack of intent. Where a particular intent is an essential element of a crime, the state must prove it. No person can be expected to testify that he looked into another person's mind and saw therein a certain intent.

"The jury may determine what a person's intention was at any given time by determining what the person's conduct was and what the circumstances were surrounding the conduct and from these things infer what his intention

completed its entire charge, it asked counsel if there were any exceptions. Neither counsel took an exception to the court's instruction on intent.[4] The jury had a copy of the court's charge during its deliberations.

As the jury was about to take a recess, it sent the court two notes, only one of which is at issue in this

was. An intent to cause death may be inferred from circumstantial evidence such as the type of wound inflicted, the number of wounds, the instrument used and the events leading to and immediately following the use of the weapon. This may be considered as evidence of the perpetrator's intent, and from such evidence, an inference may be drawn in some cases that there was an intent to cause the death of another.

"Any inference that may be drawn from the nature of the instrumentality used and the manner of its use is an inference of fact to be drawn by the jury upon consideration of these and other circumstances of the case in accordance with my previous instructions on circumstantial evidence. Declarations in [the] conduct of the accused before and after the infliction of the wound may be considered, if you find they tend to show the defendant's intent.

"Evidence of motive, or lack of it, may also be considered by you in determining the issue of intent. While motive is not an element of the crime charged, such evidence is both desirable and important as it may strengthen the state's case if an adequate motive can be shown. Therefore, an absence of evidence of motive may tend to raise a reasonable doubt of the guilt of the defendant. Motive is not a necessary element of the crime of murder. The crime may or may not be proved without consideration of motive whatsoever. Motive is not the same as intent. Proof of intent is a necessary element of the crime of murder. Motive is the reason or believed reason for causing death and is not required by law. And you are referred to my prior instructions on motive, which are incorporated here with the same force and effect.

"In this case, therefore, it will be part of your duty to draw all reasonable and logical inferences from the conduct that you may think the defendant engaged in, in light of the surrounding circumstances and from this determine whether the state has proven the element of intent beyond a reasonable doubt. This inference is not a necessary one. That is, you are not required to infer intent from the accused's conduct, but it is an inference that you may draw if you find it reasonable, logical and in accordance with the instructions on circumstantial evidence. I again remind you that the burden of proving intent beyond a reasonable doubt is on the state.

"Now, this explanation of intent applies throughout these instructions whenever I use the term intent or intentional. And when considering the element of intent, you are to consider intoxication and you are to refer to that instruction, which is incorporated here with the same force and effect."

[4] The court did provide a supplemental instruction as to burglary at the request of defense counsel.

appeal.[5] The note asked: "Is intent established if a reasonable person should have known that his actions could result in death/killing the victim?" The court stated on the record that it had discussed the note and its proposed answer with both counsel. The court then asked both counsel if either one of them had an objection to the court's responding to the jury's question in the manner discussed. Defense counsel stated, "no, Your Honor."

When the jury returned, the court instructed: "Ladies and gentlemen, I have received both of your notes . . . and I have discussed them with the attorneys . . . . As it relates to the first note . . . 'Is intent established if a reasonable person should have known that his actions could result in death/killing the victim?' I cannot give you a yes or no answer. Your decision must come from the facts that you find credible and the law instructed. Whether or not intent is established is a question of fact for you, the jury, to decide. Now, I had instructed on the definition of intent and instructed you on the things that you . . . may consider in determining intent. And if you wish me to read those to you, I will be happy to do that. Send me a note to that effect, otherwise I'm going to refer you, because you have with you in your deliberations, the court's instruction, and it is on page forty-one through forty-five of the instructions." After the jury was excused, the court again asked both counsel if there were exceptions to the court's response. Defense counsel again stated, "no, Your Honor."

On appeal, the defendant concedes that he did not raise the claim at trial. He therefore requests that this court reverse his conviction pursuant to *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), or the plain error doctrine. See Practice Book § 60-5. A defendant

---

[5] The other note requested a playback of certain testimony.

may prevail on an unpreserved claim of constitutional dimension "only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 239–40. "The first two steps in the *Golding* analysis address the reviewability of the claim, whereas the last two steps address the merits of the claim." *State* v. *Cohens*, 62 Conn. App. 345, 350, 773 A.2d 363, cert. denied, 256 Conn. 918, 774 A.2d 139 (2001). Our Supreme Court has held, however, that a defendant who waives a claim of constitutional dimension at trial cannot prevail under the third condition because the constitutional violation did not clearly exist and the defendant was not clearly deprived of a fair trial. See *State* v. *Fabricatore*, 281 Conn. 469, 481, 915 A.2d 872 (2007).

"A defendant in a criminal prosecution may waive one or more of his or her fundamental rights." *State* v. *Cooper*, 38 Conn. App. 661, 669, 664 A.2d 773, cert. denied, 235 Conn. 908, 665 A.2d 903 (1995), cert. denied, 517 U.S. 1214, 116 S. Ct. 1837, 134 L. Ed. 2d 940 (1996), citing *State* v. *Patterson*, 230 Conn. 385, 645 A.2d 535 (1994). "Waiver is an intentional relinquishment or abandonment of a known right or privilege. . . . It involves the idea of assent, and assent is an act of understanding. . . . The rule is applicable that no one shall be permitted to deny that he intended the natural consequences of his acts and conduct. . . . In order to waive a claim of law it is not necessary . . . that a party be certain of the correctness of the claim and its legal efficacy. It is enough if he knows of the existence

of the claim and of its reasonably possible efficacy. . . . Connecticut courts have consistently held that when a party fails to raise in the trial court the constitutional claim presented on appeal and affirmatively acquiesces to the trial court's order, that party waives any such claim." (Internal quotation marks omitted.) *State* v. *Felder*, 95 Conn. App. 248, 254–55, 897 A.2d 614, cert. denied, 279 Conn. 905, 901 A.2d 1226 (2006); see also *Johnson* v. *Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938) (waiver is intentional relinquishment or abandonment of known right).

Moreover, the reason that the objection must be raised at trial is to afford the court an opportunity to correct an allegedly improper instruction. See *State* v. *Ramos*, 261 Conn. 156, 170, 801 A.2d 788 (2002). "When we speak of correcting the claimed error, we mean when it is possible during that trial, not by ordering a new trial. We do not look with favor on parties requesting, or agreeing to, an instruction or a procedure to be followed, and later claiming that that act was improper." *Powers* v. *Farricelli*, 43 Conn. App. 475, 478, 683 A.2d 740, cert. denied, 239 Conn. 954, 688 A.2d 326 (1996).

"In the usual *Golding* situation, the defendant raises a claim on appeal which, while not preserved at trial, at least was not waived at trial." (Internal quotation marks omitted.) *State* v. *Fabricatore*, supra, 281 Conn. 478. In *Fabricatore*, our Supreme Court stated that it had not previously addressed the situation in which "a defendant requesting *Golding* review implicitly may have waived a claim as to the propriety of jury instructions at trial, [but] the Appellate Court has done so on several occasions." Id.[6] Our Supreme Court, in

[6] See *State* v. *Duncan*, 96 Conn. App. 533, 559–60, 901 A.2d 687 (waived claim concerning elements of alteration of firearm by expressing satisfaction with charge), cert. denied, 280 Conn. 912, 908 A.2d 540 (2006); *State* v. *Wortham*, 80 Conn. App. 635, 647–48, 836 A.2d 1231 (2003) (waived claim regarding self-defense instruction by agreeing to charge during charging

determining whether the claim there had been waived, cited the analysis of this court in *State* v. *Cooper*, supra, 38 Conn. App. 664–70, and *State* v. *Duncan*, 96 Conn. App. 533, 901 A.2d 687, cert. denied, 280 Conn. 912, 908 A.2d 540 (2006).

In *Duncan*, this court concluded that "the defendant not only failed to object to the court's instruction, but also voiced satisfaction with it. . . . To allow the defendant to seek reversal now that his trial strategy has failed would amount to allowing him to induce potentially harmful error, and then ambush the state with that claim on appeal." (Citations omitted.) *State* v. *Duncan*, supra, 96 Conn. App. 560; see also *State* v. *Alston*, 272 Conn. 432, 456, 862 A.2d 817 (2005) (declining review where defense counsel induced departure from statutory procedure for jury selection); *State* v. *Gibson*, 270 Conn. 55, 68, 850 A.2d 1040 (2004) (declining review where defendant encouraged or prompted trial court to refrain from giving instruction); *State* v. *Cruz*, 269 Conn. 97, 106, 848 A.2d 445 (2004) (declining review where court used exact language from defendant's request to charge and no exception taken). On the basis of the cases cited in *Fabricatore* and the analysis therein, we conclude that defense counsel's expression of satisfaction with the court's jury instruction constituted a waiver of the defendant's constitutional rights regarding a proper jury instruction, and the claim, therefore, fails under the third prong of *Golding*.[7] *State* v. *Duncan*, supra, 560.

conference and arguing in accord with charge), cert. denied, 268 Conn. 901, 845 A.2d 406 (2004); *State* v. *Hersey*, 78 Conn. App. 141, 156–60, 826 A.2d 1183 (waived requirement that state prove existence of protective order by stipulating to order's existence), cert. denied, 266 Conn. 903, 832 A.2d 65 (2003); *State* v. *Arluk*, 75 Conn. App. 181, 191–93, 815 A.2d 694 (2003) (waived requirement that state prove existence of protective order by referencing it and not objecting to state's references to it); *State* v. *Cooper*, supra, 38 Conn. App. 668–69 (waived claim by stipulating to instruction that Interstate 84 is public highway); see also *State* v. *Fabricatore*, supra, 281 Conn. 478 n.12.

[7] "Although our Supreme Court decided *Fabricatore* pursuant to a *Golding* analysis, an argument has been made that a waiver analysis should be

The defendant in this case claims that he did not waive his claim and directs our attention to *United States* v. *Padron*, 1993 U.S. App. LEXIS 26260 (9th Cir. September 30, 1993). That case is distinguishable on its facts. During jury deliberations in *Padron*, the jury asked for a clarification of the law of entrapment. Initially, defense counsel agreed with the prosecutor that the court should give an instruction pursuant to *United States* v. *North*, 746 F.2d 627, 629–30 (9th Cir. 1984), cert. denied, 470 U.S. 1058, 105 S. Ct. 1773, 84 L. Ed. 2d 832 (1985). After further discussion, defense counsel objected to giving the proposed instruction without also giving the five factor test for predisposition. See *United States* v. *Sotelo-Murillo*, 887 F.2d 176, 181 (9th Cir. 1989). The court, however, gave only the *North* instruction. After the jury had returned to its deliberations, defense counsel stated to the court that the supplemental instruction had not addressed the jury's question. The court disagreed but noted that defense counsel's comments were " 'certainly a matter of record.' " *United States* v. *Padron*, supra, 1993 U.S. App. LEXIS 26290. On appeal, the United States argued that the defendant's claim regarding the supplemental jury instruction was not reviewable because defense counsel had waived it. The United States Court of Appeals for the Ninth Circuit did not agree that the claim had been waived because defense counsel had stated his concerns on the record.

In the case before us, the record discloses that defense counsel acquiesced to the supplemental

applied when an appellant waives a constitutional right at trial but attempts to undo the waiver by asserting a constitutional claim on appeal and requesting *Golding* review. See *State* v. *Arluk*, [75 Conn. App. 181, 193, 815 A.2d 694 (2003)] (*Landau, J.*, concurring). Although the *Fabricatore* court relied, in part, on *Arluk*, it did not distinguish a *Golding* analysis from a waiver analysis, although it implied that a waiver analysis equally would be valid by noting that a change in strategies would amount to induced error. See *State* v. *Fabricatore*, supra, 281 Conn. 480–81." *State* v. *McDaniel*, 104 Conn. App. 627, 635 n.6, 934 A.2d 847 (2007), cert. denied, 285 Conn. 912, 943 A.2d 471 (2008).

instruction when he twice stated that he had no objection to it. The claim on appeal, therefore, was waived, and we will not afford it review.[8]

## II

The defendant's second claim is that the court improperly instructed the jury with regard to intoxication as it pertains to intent, thereby diluting the state's burden of proof in that regard. We disagree.

At trial, evidence was presented that the defendant had consumed alcoholic beverages at the wedding reception. The defendant requested that the court instruct the jury on intoxication. Although there was conflicting evidence as to the amount of alcohol the defendant had consumed, the court concluded that there was enough evidence to present the question to the jury.

The defendant challenges the following two sentences of the court's charge on intoxication. "You must, if you are to find [for] the defendant on this issue, find that while he was committing the conduct in question, if you find that fact proven, he was so intoxicated that his mind was incapable of forming an intent to engage in such conduct. It is only if you find that his intoxication was to this degree and with this result that you should consider." The defendant claims that the court misstated the law by instructing that "the level of intoxication had to rise to the level that it negated the defendant's general intent to engage in the proscribed conduct rather than correctly instructing that the level

---

[8] We also decline to apply the plain error doctrine to the defendant's claim. "[A] valid waiver . . . thwarts plain error review of a claim. [The] *Plain Error Rule may only be invoked in instances of forfeited-but-reversible error* . . . and cannot be used for the purpose of revoking an otherwise valid waiver. This is so because if there has been a valid waiver, there is no error for us to correct." (Internal quotation marks omitted.) *State* v. *Corona*, 69 Conn. App. 267, 274, 794 A.2d 565, cert. denied, 260 Conn. 935, 802 A.2d 88 (2002).

of intoxication had to only rise to the level that it affected his capacity to form a specific intent." We disagree with the defendant's characterization of the court's instruction on intoxication because it isolates two sentences of an instruction that consumes more than two pages of the trial transcript.

"When reviewing the challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Griggs*, 288 Conn. 116, 124, 951 A.2d 531 (2008).

On the basis of our review of the court's complete instruction to the jury, including its instructions on the crimes with which the defendant was charged, particularly murder, specific intent; see footnote 3; and intoxication, we conclude that the court's instruction on intoxication did not dilute the state's burden of proof or that it reasonably was possible that the jury was misled. See *State* v. *Davis*, 283 Conn. 280, 334, 929 A.2d 278 (2007) (must consider charge as whole to determine whether reasonably possible instruction misled jury). When instructing the jury on the crimes with which the defendant was charged, the court noted that he had to have had the specific intent to commit the crime of murder.

With regard to intoxication, the court began its instruction by stating: "When deliberating the specific

intent element of a crime, you must consider intoxication." Later, the court instructed that "if you find that the defendant was so intoxicated at the time of the crime charged that he was not mentally able even to form the specific intent to commit the crime, then the intent element of the crime charged would not be provided, and you will be required to acquit the defendant of that charge." In the sentence immediately following the challenged instruction, the court stated: "If, however, you find that he was not intoxicated or that he was intoxicated but not so intoxicated that he could not form the required intent, then you should disregard the evidence of his intoxication and not consider it in his defense." The court's entire instruction clearly conveyed to the jury that it had to find that the defendant had the specific intent to commit the crimes with which he was charged to return a verdict of guilty.

"[A] refusal to charge in the exact words of a request . . . will not constitute error if the requested charge is given in substance." (Internal quotation marks omitted.) *State* v. *Sulser*, 109 Conn. App. 852, 878, 953 A.2d 919, cert. denied, 289 Conn. 939, 959 A.2d 1006 (2008). When evidence of a defendant's intoxication has been admitted, the jury should be instructed that it must determine whether the defendant committed the acts alleged, whether he was intoxicated at the time and whether the intoxication was such as to render him unable to form the requisite intent. See, e.g., *State* v. *Ortiz*, 217 Conn. 648, 662–64, 588 A.2d 127 (1991); *State* v. *Kellman*, 56 Conn. App. 279, 282–83, 742 A.2d 423, cert. denied, 252 Conn. 939, 747 A.2d 4 (2000); Connecticut Criminal Jury Instructions (2007 Ed.) § 2.7-1 available on the Connecticut Judicial Branch website, http://www.jud.ct.gov/ji/Criminal/part2/2.7-1.htm (accessed 3/4/09).

Moreover, in the course of its instruction on intoxication, the court stated: "This does not mean, however,

that the defendant has the burden of proving that he was too intoxicated to form the intent required as an element of the crime. The state retains the burden of proof beyond a reasonable doubt on the issue of intent as on all of the other elements of the crime." Viewed in its entirety, the instruction given by the court conformed to our law and did not dilute the state's burden of proof.

## III

The defendant's third claim is that the court abused its discretion by permitting the state to impeach his credibility with evidence of his four felony drug convictions. We do not agree.

The following facts are relevant to the defendant's claim. After the state presented its case-in-chief, the defendant filed a motion in limine to preclude the state from offering evidence of the defendant's prior criminal record[9] and the fact that he was incarcerated at the time of trial. In his motion, the defendant claimed that such evidence was not probative of any issue in the present case and that, in any event, it was more prejudicial than probative. The state argued, in opposition to the motion, that if the defendant testified, the state intended to impeach his credibility with his four most recent convictions, which were narcotics offenses, without mentioning them by name. The court ruled that the state could impeach the defendant with all four convictions, evidence that would be admitted as unnamed felonies. Although the defendant's June 13, 1996 conviction was slightly more than ten years old,[10] the court ruled that the defendant had served a twenty-two month sentence and that the ten year limit for the

---

[9] The defendant had been convicted of possession of narcotics on October 8, 2003, possession of narcotics with intent to sell on May 22, 1998, possession of narcotics with intent to sell on April 4, 1997, and attempt to sell narcotics on June 13, 1996.

[10] Trial of this matter was held in July, 2006.

admission of prior convictions began when the defendant was released from incarceration. See Conn. Code Evid. § 6-7 (a), commentary ("[t]he supreme court has established no absolute time limit that would bar the admissibility of certain convictions, although it has suggested a ten year limit on admissibility measured from the later of the date of conviction or the date of the witness' release from the confinement imposed for the conviction"); Fed. R. Evid. 609 (b) (ten year limitation from conviction or release from resulting confinement).

During cross-examination of the defendant, the prosecutor asked the defendant if he had been convicted of the four unnamed felonies. The defendant responded affirmatively. Immediately thereafter, the court instructed the jury that "[e]vidence of the conviction of a crime is not admissible to prove the guilt of the defendant in this particular case" but that the jury could consider it for the sole purpose of assessing the defendant's credibility. The court repeated the instruction in its final charge.

"A trial court may entertain a motion in limine made by either party regarding the admission or exclusion of anticipated evidence." (Internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Gilmore*, 289 Conn. 88, 127, 956 A.2d 1145 (2008); see also Practice Book § 42-15. "[T]he motion in limine . . . has generally been used in Connecticut courts to invoke a trial judge's inherent discretionary powers to control proceedings, exclude evidence, and prevent occurrences that might unnecessarily prejudice the right of any party to a fair trial. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did." (Internal quotation marks omitted.) *Connecticut*

*Light & Power Co.* v. *Gilmore*, supra, 128. "The burden lies with the party objecting to the admission of evidence of prior convictions to demonstrate the prejudice that is likely to arise from its admission." *State* v. *Muhammad*, 91 Conn. App. 392, 398, 881 A.2d 468, cert. denied, 276 Conn. 922, 888 A.2d 90 (2005). To prevail, the defendant must demonstrate substantial prejudice or injustice. *State* v. *Askew*, 245 Conn. 351, 360–61, 716 A.2d 36 (1998).

Generally, evidence of a defendant's prior convictions is not admissible. *State* v. *Muhammad*, supra, 91 Conn. App. 397. When a criminal defendant takes the witness stand to exercise his fifth amendment right to testify, his credibility is subject to scrutiny just as that of any other witness. Id., 397 n.3. "The credibility of a witness may be attacked by introducing the witness' conviction of a crime if the maximum penalty for that conviction is imprisonment exceeding one year. See General Statutes § 52-145 (b); [Conn. Code Evid. § 6-7 (a)]. . . . Recognizing that the inherent authority of the trial court to exclude evidence whe[n] its prejudicial tendency outweighs its probative value is particularly applicable to prior convictions otherwise qualifying for admission . . . [t]hree factors have . . . been identified as of primary importance in considering whether a former criminal conviction is to be admitted: (1) the extent of the prejudice likely to arise; (2) the significance of the commission of the particular crime in indicating untruthfulness; and (3) its remoteness in time." (Internal quotation marks omitted.) *State* v. *Dorans*, 261 Conn. 730, 754–55, 806 A.2d 1033 (2002).

The basis of the defendant's claim is that evidence of his prior convictions not only was prejudicial, but also that it was not probative of his veracity. He notes that "crimes involving larcenous intent imply a general disposition toward dishonesty or a tendency to make false statements. . . . [I]n common human experience

acts of deceit, fraud, cheating, or stealing . . . are universally regarded as conduct which reflects on a [person's] honesty and integrity . . . ." (Internal quotation marks omitted.) *State* v. *Erhardt*, 90 Conn. App. 853, 868, 879 A.2d 561, cert. denied, 276 Conn. 906, 884 A.2d 1028 (2005). Felony narcotics convictions, he argues, are not "uncommonly probative in demonstrating that [the witness] was untruthful." *State* v. *Swain*, 101 Conn. App. 253, 267–68, 921 A.2d 712, cert. denied, 283 Conn. 909, 928 A.2d 539 (2007).

The defendant's argument fails because our legislature has decided that "records of [all] crimes involving sentences of more than one year affect the credibility of a witness . . . ." (Internal quotation marks omitted.) *State* v. *Rivera*, 221 Conn. 58, 74, 602 A.2d 571 (1992). "The theory behind the admissibility of [prior] convictions [that do not directly bear on veracity] as evidence of credibility posits that conviction of a crime demonstrates a bad general character, a general readiness to do evil and that such a disposition alone supports an inference of a readiness to lie in the particular case . . . ." (Internal quotation marks omitted.) *State* v. *Geyer*, 194 Conn. 1, 12, 480 A.2d 489 (1984). "To avoid unwarranted prejudice to the witness, when a party seeks to introduce evidence of a felony that does not directly bear on veracity, a trial court ordinarily should permit reference only to an unspecified crime carrying a penalty of greater than one year that occurred at a certain time and place." *State* v. *Pinnock*, 220 Conn. 765, 780, 601 A.2d 521 (1992).

The defendant was charged with the most serious of crimes, murder. The issue in this case was whether he intended to kill the victim, as the defendant readily admitted that he had stabbed the victim. We conclude that the court did not abuse its discretion by admitting evidence of the defendant's prior convictions of four unnamed felonies. The evidence was probative of the

defendant's credibility. Moreover, the prejudicial effect of the evidence was tempered by the court's prompt instruction to the jury on the proper use of the evidence. We cannot say on the record before us that the defendant was prejudiced unduly by the admission of the evidence.

## IV

The defendant's fourth claim is that he was denied the constitutional right to due process and a fair trial due to prosecutorial impropriety during final argument. The state concedes that one of the prosecutor's comments was improper but contends that the defendant was not denied a fair trial. We agree with the state.

The parties agree that the primary issue at trial was whether the defendant intended to kill the victim. The jury heard evidence regarding the defendant's theories of defense, namely, intoxication and extreme emotional disturbance. Both defenses implicated the defendant's intent. On appeal, the defendant claims that during the state's rebuttal argument, the prosecutor improperly expressed his personal opinion about the defendant's guilt, the credibility of the defendant and other witnesses, disparaged defense counsel and the defendant's theories of defense, and impinged on the defendant's constitutional rights. At trial, defense counsel objected to only one of the remarks that the defendant now claims were improper.

"[I]n analyzing claims of prosecutorial [impropriety], [whether they are preserved or not] we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial. Put differently, [impropriety] is [impropriety], regardless of its ultimate effect on the fairness of the trial; whether

that [impropriety] caused or contributed to a due process violation is a separate and distinct question . . . ." (Internal quotation marks omitted.) *State* v. *Stevenson*, 269 Conn. 563, 572, 849 A.2d 626 (2004). "In determining whether prosecutorial [impropriety] was so serious as to amount to a denial of due process, [our Supreme Court], in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted.) *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987).

The *Williams* factors are to be applied to the entire trial "because there is no way to determine whether the defendant was deprived of his right to a fair trial unless the [impropriety] is viewed in light of the entire trial." *State* v. *Stevenson*, supra, 269 Conn. 573. Moreover, defense counsel's failure to object during trial plays "a significant role in the application of the *Williams* factors. . . . [W]hether a new trial or proceeding is warranted depends, in part, on whether defense counsel has made a timely objection to any [incident] of the prosecutor's improper [conduct]. When defense counsel does not object, request a curative instruction or move for a mistrial, he presumably does not view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial." Id., 575.

A

We will first determine whether any of the challenged remarks of the prosecutor during rebuttal constituted impropriety. The following principles apply to our review.

"[P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . In determining whether such [an impropriety] has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) *State* v. *Skidd*, 104 Conn. App. 46, 64–65, 932 A.2d 416 (2007). "The prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions." (Internal quotation marks omitted.) *State* v. *Grant*, 286 Conn. 499, 546, 944 A.2d 947, cert. denied, 555 U.S. 916, 129 S. Ct. 271, 172 L. Ed. 2d 200 (2008). Nonetheless, "[t]he prosecutor may . . . argue to the jury that the *evidence* and the reasonable inferences to be drawn therefrom should lead the jury to a conclusion as to the credibility of witnesses." (Emphasis in original; internal quotation marks omitted.) *State* v. *Morgan*, 70 Conn. App. 255, 287, 797 A.2d 616, cert. denied, 261 Conn. 919, 806 A.2d 1056 (2002).

In his appeal, the defendant has cited many of the prosecutor's remarks, often not in context,[11] that he

[11] We have reviewed carefully each of the defendant's claims but decline to address every one of them in this opinion, as our response to the majority of them would be the same, that is, that the prosecutor was asking the jury

claims are improper, direct or indirect expressions of the prosecutor's personal opinion of the defendant's credibility[12] and guilt and disparaging of his theories of defense and trial counsel, thus impinging on his constitutional rights. In making his claims, the defendant ignores the fact that he elected to testify at trial, thus placing his credibility in question, as every witness does. See, e.g., *State* v. *Ciccio*, 77 Conn. App. 368, 387, 823 A.2d 1233, cert. denied, 265 Conn. 905, 831 A.2d 251 (2003). "[I]t is not improper for a prosecutor to comment on the credibility of a witness as long as he neither personally guarantees the witness' credibility nor implies that he has knowledge of the witness' credibility outside the record." (Internal quotation marks omitted.) *State* v. *Wickes*, 72 Conn. App. 380, 388, 805 A.2d 142, cert. denied, 262 Conn. 914, 811 A.2d 1294 (2002).

to draw a reasonable inference about the defendant's credibility or guilt on the basis of evidence presented at trial. Claims that merit a fuller analysis are discussed.

[12] The defendant claims that the highlighted portion of the prosecutor's argument was improper: "And I want to point out something very important because the defense has made a big deal about it, and the defendant made a big deal about it on the [witness] stand. Defendant said, 'Geez, I was off my meds. That's why I did this. I was off my meds.' Well, listen to that booking tape. . . . [Y]ou may remember when the police asked, and they're going through the list of different things . . . . [O]ne of the questions they asked him is, 'are you on any medication?' And what does he tell the police just literally minutes or an hour or so after he killed [the victim]? He says, 'I took them this evening. I took them tonight.'

"*So, again, do you want to believe what the defendant says up here? Defendant, the guy with four prior convictions, four prior felony convictions. The judge will tell you how that's used. Four different times, four different felony convictions. Do you want to believe the defendant, who has a strong motive to tell you what he needs to tell you to get off that murder charge? And then when you evaluate the defendant's credibility, consider how many times he said things that weren't true.* . . .

"One thing he told you here [was] that he hadn't taken meds for a few days. And at the time, at the police station, he says he just took the meds that night. Police are asking him, start joking with him about dancing with a girl. What does the defendant say? 'Oh, I don't look at women that way.' He has a baby by another woman. If you believe Belinda Pagan, they had a relationship for at least that year. He talked about the bomb in the microwave. There was no bomb." (Emphasis added.)

The defendant takes particular exception to the prosecutor's having argued that the jury should consider his four felony convictions when assessing the defendant's credibility. "[I]t is not improper for the prosecutor to comment [on] the evidence presented at trial and to argue the inferences that jurors might draw therefrom . . . . We must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade them to draw inferences in the state's favor, on the one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand." (Internal quotation marks omitted.) *State* v. *Fauci*, 282 Conn. 23, 36, 917 A.2d 978 (2007). As we pointed out in part III, our law permits the admission of felony convictions for the purpose of assessing credibility. See Conn. Code Evid. § 6-7; *State* v. *King*, 289 Conn. 496, 518, 958 A.2d 731 (2008). Therefore, it was not improper for the prosecutor to argue to the jury that it should consider evidence of the defendant's unnamed felony convictions when assessing his credibility.

The defendant claimed and presented evidence that he had not taken the medicine prescribed for his psychiatric condition and that he was intoxicated. Defense counsel argued that there was no question that the defendant stabbed the victim but that the defendant did not have the intent to murder the victim and that the jury, therefore, should find the defendant guilty of the lesser included offense of manslaughter. During his rebuttal argument, the prosecutor noted the contradictions in the defendant's testimony and other evidence. The prosecutor also asked the jury to consider the fact that several hours had passed since the defendant had consumed alcohol and the time of the murder and that in that period of time, the defendant had undertaken a forty minute walk home.

When the prosecutor addressed the defense of extreme emotional distress, he noted that the state had the burden of proving that the defendant murdered the victim but that the burden of proving extreme emotional distress was on the defendant. The prosecutor stated: "And the first thing I want to emphasize is that the defendant has the burden of proof in proving [extreme emotional disturbance]. *I submit to you they haven't met that burden of proof, and they can't meet it because they have to rely on the defendant. And I submit to you that you can't believe a word the defendant says either on the [witness] stand or even for that matter when he's at the police station.*" (Emphasis added.) Throughout his argument, the prosecutor noted inconsistencies between the defendant's testimony and prior statements and other evidence. In this particular statement, the prosecutor asked the jury to use its common sense and to draw certain inferences when weighing the defendant's claim of extreme emotional distress.

Although the defendant claims that the following statements by the prosecutor were expressions of personal opinion about the defendant's guilt, we disagree and conclude that they were expressions of what the jury reasonably could infer from the evidence: "*I do want to emphasize, too, the booking tape. You're going to hear him repeatedly say that he was going to finish the job. What job was he going to finish? Obviously, it was—you have to decide— the conclusion is [that] the job was—he didn't think that he killed [the victim], that he intended to kill him and the job was to kill him.*" "*The simple fact that the defendant was intoxicated, if you conclude that he was, when I ask the question, 'did he appear intoxicated?' That really wasn't as much to say [that] he had anything to drink when I asked that; it was more to show you that whatever level of intoxication it was, it certainly wasn't enough for him to say, 'Gee, I don't know what I'm doing.'*" "*There is no RPO*

*[really pissed off defense] in Connecticut. I'll submit to you [that] that's what we're dealing with here. RPO— just because you're really pissed off is not a reason. . . . [W]hen you have the intent to kill someone, you don't all of a sudden get EED [extreme emotional disturbance] because you're really pissed off. You're going to hear [that] there's some specific requirements that the judge will tell you about extreme emotional disturbance. Those aren't present here.*"[13] (Emphasis added.)

We agree with the defendant, however, that the prosecutor stepped over the line of acceptable argument when he stated that "[t]he state's case does not rest on Belinda Pagan, but I submit to you that she was credible. She did not want to help the state. You could see I was asking her questions. She clearly wanted to say as little as possible if it would hurt the defendant. And I submit to you that . . . what she told you then was credible." The use of the phrase, "I submit to you," does not change the fact that the prosecutor expressed his personal opinion about Pagan's credibility and the meaning of her testimony. Defense counsel, however, immediately objected to the comment, and the court sustained the objection. The court also instructed the jury that "attorneys are not to make opinions. It is for you to decide."

The defendant also claims that the prosecutor impinged on the defendant's constitutional rights by characterizing defense counsel's final argument. The prosecutor stated that "[i]f you follow all the facts, this whole argument, which I submit to you is a completely emotional argument, 'poor Anthony.' Because [defense

---

[13] Although we do not conclude that this particular portion of the prosecutor's argument was improper, we acknowledge that it is not a particularly elegant argument. See *State* v. *Bardliving*, 109 Conn. App. 238, 256, 951 A.2d 615 (calling defendant liar), cert. denied, 289 Conn. 924, 958 A.2d 153 (2008).

counsel] also made a big point of saying Anthony fessed up to what he did right from the beginning. Well, sure, on the scene he's the only one in the house. He's the one that's chasing [the victim] around there. What is he supposed to say? Well, he clearly admitted he stabbed him. What's he going to come in here and tell you? Is he going to say, 'I—gee, I—I don't know who did it. Of course, not." This argument was sarcastic, but not improper; it focused on the inconsistencies between the evidence—the defendant broke into the victim's apartment and killed him in a fit of rage—and the theories of defense—the defendant was traumatized by the victim's treatment of him and was too drunk to form the intent to murder. Moreover, the argument did not disparage defense counsel but the logic and theories espoused by the defense.

## B

We now turn to the one instance of prosecutorial impropriety that we have identified, regarding Pagan's credibility, to determine whether the defendant was denied a fair trial. In doing so, we must apply the *Williams* factors to the prosecutor's comment that Pagan was a credible witness. The remark was not invited. We again note that defense counsel immediately responded to the comment by objecting. The court not only sustained the objection but also provided a curative instruction to the jury that counsel was not to offer opinions and that it was the jury's responsibility to determine credibility. In its final charge, the court also instructed the jury that the arguments of counsel were not evidence and that the jury was to determine the facts. Without evidence to the contrary, we must assume that the jury followed the court's instruction. See *State* v. *Griggs*, supra, 288 Conn. 142. We conclude, therefore, that the defendant was not denied a fair trial by this one isolated instance of prosecutorial impropriety, which was not severe. Pagan's testimony that the

defendant telephoned her on the night of the crime and asked her to come get him because he wanted to be a family with her and the child was not central to the question of whether the defendant intended to murder the victim. Finally, the state's case against the defendant was strong, as he admitted that he stabbed the victim. The only disputed question for the jury to determine was whether the defendant intended to murder the victim.

The judgment is affirmed.

In this opinion DUPONT, J., concurred.

FLYNN, C. J., concurring. From the time he was a boy of seven, the defendant experienced psychological problems. Only a week before Vines' death at the hands of the defendant, the defendant had been hospitalized after a failed suicide attempt. He had not taken the medicines prescribed for his mental issues for a few days before the fight in which Vines was stabbed. On the night of the fatal encounter, the defendant had consumed fifteen beers and a quantity of wine, and Vines' cousin, Ms. Robinson, recalled that the defendant and Vines had been drinking heavily at the wedding reception that they all had attended.

It is against this evidentiary backdrop that the jury asked the question: "Is intent established if a reasonable person should have known that his actions could result in death/killing the victim?" Despite clear prior instructions from the court, the question manifested confusion remaining on the part of the jury, which existed about whether the reasonable man standard, applicable to negligent conduct, could be used instead of the specific intentional conduct that the law requires in a murder case, namely, the defendant's conscious objective to cause the death of Vines. In my opinion, the jury should have been told that it could not use such a standard to find the defendant guilty of murder and that to find him

guilty, it had to find that he consciously intended to cause Vines' death.

I write separately because I agree with the words of then Chief Judge Dupont in *State* v. *Fletcher*, 10 Conn. App. 697, 705, 525 A.2d 535 (1987), aff'd, 207 Conn. 191, 540 A.2d 370 (1988), that, "[c]larification of the instructions when the jury or one of its members manifests confusion about the law is mandatory." This is especially true when the crime is murder, and the sentence is sixty years. This is also especially true when, as the state briefed in this case, "there was no dispute that the defendant caused the victim's death. The sole contested issue at trial was whether he had the requisite intent for murder."

If the defendant lacked the conscious intent to cause Vines' death, he could not be guilty of murder. Nevertheless, in this case, if the jury did not find that he had such a specific intent but, instead, believed that a reasonable person in the defendant's shoes should have foreseen that in holding the knife in the manner in which the defendant held it, Vines' death was a likely result, the jury might have found the defendant guilty of murder, while the result warranted by his less culpable mental state would have been to have found him guilty of manslaughter or negligent homicide. On the basis of the evidence of mental illness, the defendant's being under the influence of alcohol and the jury's question, such a result is not unfathomable.

When asked if he had any objection to the way the court proposed to handle the jury's question, defense counsel simply said, "no," thereby offering no objection, while not explicitly agreeing with the court's proposal. The *Golding* rule,[1] permitting appellate review of issues never raised by objection before the trial judge, has been criticized because, by its very nature, the case on

---

[1] See *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

appeal becomes something it never was at trial by raising matters that the trial judge did not and could not address for lack of objection. That is true of every case reviewed under *Golding*. However, if we are going to have such a rule, it seems counterintuitive to review an unpreserved issue concerning jury confusion under *Golding* because the trial attorney took no objection but then to deny any relief because the trial attorney took no objection.

I concur in the result, reached by the majority in the present case, but only because it appears to be mandated, and we to be constrained, by our Supreme Court's decision in *State* v. *Fabricatore*, 281 Conn. 469, 481–82, 915 A.2d 872 (2007), in which the court held that a defendant requesting *Golding* review implicitly, by his counsel's acquiescence, may waive a constitutional right to require the state to prove, beyond a reasonable doubt, all necessary elements of the criminal charge against him.